## LYMAN C. STANFORD *vs*. SAMUEL G. MCGILL.

Opinion filed November 1st, 1897.

### Repudiation of Contract—Effect.

The repudiation of a contract before the time for performance arrives does not constitute a breach thereof. The only effect of such repudiation is to dispense with an offer to perform by the other party; if such refusal to stand by the agreement is not withdrawn before the performance is due under the terms thereof.

### Delivery of Goods of Like Description—When Sufficient.

The vendor in a contract to sell property of a certain description, no particular articles being agreed upon, can, after he has made, before the day of delivery, an *ex parte* selection of the property he intends to deliver under such contract, sell such property to another without being guilty of breach of agreement. All that the law requires of him is, that he make delivery of property of the description mentioned in the contract at the time delivery is due.

### Offer to Sell to Another Not a Breach of Prior Executory Contract of Sale.

Whether the sale, by the vendor in an executory contract for the sale of specific property, of the very property to which such contract relates before the day for delivery thereunder has arrived, is a breach of agreement on the ground that the vendor has thereby put it out of his power to perform the agreement, not decided. But the mere making of a second executory contract to sell the same property is not of itself a breach of the prior executory contract. The vendor does not thereby incapacitate himself from carrying out his contract.

### Waiver of Offer to Perform.

Where a party has an option to deliver property, under a contract, at any time between certain dates, he must, if he intends to treat the time of performance as having arrived and therefore to hold a repudiation of the agreement by the vendee before the last day for performance has arrived as a breach thereof, notify the vendee that he has exercised his option to call for an earlier delivery. But no offer to perform is necessary, as that is waived by the vendee's refusal to perform.

### Measure of Damage for Breach of Executory Contract of Sale.

The measure of damages in an action by a vendor to recover damages for breach by a vendee of an executory contract of purchase and sale, is fixed by §§ 4988 and 5009, Rev. Codes, where the vendor does not elect to proceed under § 4833, Rev. Codes.

**Motion for Directed Verdict—When Waived.**

> Where a suitor moves the court to direct a verdict in his favor and his motion is over-ruled, he must thereafter specifically request that the question he desires to have submitted to the jury be so submitted or he is deemed to have agreed that all controverted questions of fact be decided by the court. If he makes no such request he cannot complain of a directed verdict if the evidence is conflicting. But the rule will not apply if the verdict would be held to be unsupported by evidence, although voluntarily tendered by the jury.

**Measure of Damage Where Property Resold.**

> It is only when property has been re-sold by the vendor in the manner prescribed by § 4833 that he can recover the damages mentioned in subdivision 1, of § 4988; and if it is not so sold, the measure of damages is governed by subdivision 2, of § § 4988 and 5009. · An abortive attempt to proceed under § 4833 will not preclude a recovery of damages under subdivision 2, of § § 4988 and 5009.

Appeal from District Court, Cass County; *McConnell*, J.

Action by Lyman C. Stanford against Samuel G. McGill and others. Judgment for plaintiff. Defendants appeal.

Reversed.

*Ball, Watson & Maclay*, for appellants.

*William C. Resser*, and *Arthur B. Wright*, for respondent.

CORLISS, C. J. On the 3d of August, 1895, plaintiff and defendants entered into an executory contract for the sale by plaintiff to defendants of 5,000 bushels of No. 1 flax, at $1 a bushel, to be delivered at Kelso, in Traill County, in this state, during the month of September of that year. On the 7th of September following, the defendants notified the plaintiff by letter that they did not recognize the binding force of the agreement, and therefore refused to carry it out on their part. This letter was received by him September 8th. At that time the plaintiff had not exercised his option to make delivery at any time during that month, as was his right under the contract. The action was to recover damages for breach of this agreement, and on the trial of the case the court directed a verdict for the plaintiff. The defendants on this appeal urge certain reasons why they should not be held liable. They insist that the crop of flax raised by plaintiff on his farm was mortgaged, and that, therefore, he could

not give them an unincumbered title. But whether he could deliver the flax, according to his contract, free from all liens, could not be determined in advance of the actual delivery thereof. In the meantime the mortgage might be paid, or the mortgagee might release the 5,000 bushels from the lien of his mortgage. Had the plaintiff tendered the defendants 5,000 bushels with a lien thereon, they would have been justified in refusing to receive the same; and had he not, in proper time, delivered to them the flax free from all incumbrances, they could have held him responsible for breach of contract. But they had no right to settle for the plaintiff, in advance of the time when he was required by the terms of the contract to make delivery, the question whether he could and would deliver unincumbered flax. Moreover, the specific property to be delivered was not designated in the contract. It was not necessary that the plaintiff should deliver any of the flax raised upon his own farm. Delivery of any 5,000 bushels of flax, of the quality and grade specified in the agreement, would have constituted compliance with the contract on the part of the plaintiff. It is further urged that plaintiff was not able to deliver the flax for the reason that up to the end of the month of September he had threshed only 642 bushels. If it should be conceded that plaintiff had not, and could not have, threshed a bushel during the month of September, this would not establish any inability on his part to comply with the terms of his agreement. A person may agree to sell property which he does not even own, and the purchaser cannot on that account insist, as an excuse for violating his agreement, that it is not in the power of the vendor to make good his promise. This fact cannot be ascertained until the day for delivery has come and passed without any delivery being made. It is claimed that plaintiff rescinded the contract by selling the 5,000 bushels in Duluth on the 9th of September, two days after the defendants had written plaintiff that they would not fulfill their agreement. The question whether the contract was rescinded is so related to the question whether it was violated by the defendants, and the fur-

ther question when it was broken by them, if at all, that it will conduce to clearness of discussion to treat these questions together.

On receiving from defendants their letter of the 7th of September, repudiating the contract, the plaintiff wrote them that he expected them to carry out the agreement, and that he would give them further time for consideration. In this letter, which was written September 9th, he says, among other things: "Altogether, I am inclined to defer my conclusions until you have taken time to review the transaction, and see the unfavorable light your letter of the 7th puts you in. I certainly shall expect you to take flax as per agreement. Please let me hear from you again by return mail." On the same day he sold on the Board of Trade in Duluth 5,000 bushels of flax, through brokers in that city. In his testimony he speaks of this flax as being the same flax which he had agreed to sell to defendants. He says: "When I received this letter [referring to the one dated September 7th], I sold the 5,000 bushels of flax in Duluth. I sold it to Wheeler, Carter & Co. On September 9th I telegraphed Wheeler, Carter & Co., of Duluth, relative to the sale of this 5,000 bushels of flax, as follows: "Sell five October flax. Answer." Wheeler, Carter & Co. answered by wire that they had sold the flax; and the same day they confirmed their telegram by a letter, in which they explained in detail the circumstances and terms of the sale. But it is undisputed that the title to the flax sold in Duluth did not pass to the vendees in such sale, nor was possession thereof delivered at any time during the month of September. The contract was merely an executory contract for the sale of 5,000 bushels of flax, to be delivered in October. On the 11th of September the plaintiff, not having received from the defendants any answer to his letter of the 9th, again wrote them; and on the 13th they sent him a reply, in which they reiterated their purpose to treat the alleged contract as possessing no binding force. In this letter they said: "We expressly deny that any contract exists which obligates you to deliver to us, or we to receive from

you, flax, at any time, or at any price." This closed the correspondence between the parties. The plaintiff did not thereafter inform the defendants that he elected to treat their second refusal to recognize the contract as a breach thereof; nor did he advise them, after their last refusal, that he had decided to exercise his option to insist upon the fulfillment of the agreement before September 30th. The contract gave him the option to call for performance at any time during the month of September. This action was not commenced until after the 30th of that month.

We will first consider the case as though there was a fixed time for performance of the agreement, and that that time was September 30th. Under the English doctrine, which has apparently met with much favor in this country, the plaintiff, even assuming that the day for delivery of the flax was September 30th, and that he had no right to call for an earlier performance of the agreement, might have elected to treat the defendants' premature refusal to carry out the contract as an immediate breach thereof. *Hochster* v. *De La Tour*, 2 El. & Bl. 678. But he did not so elect. On the contrary, he wrote the defendants that he would give them time to reflect and then determine what they would do, but that in any event, no matter what their decision might be, he would hold them to the contract. His words were: "I shall expect you to take flax as per agreement." Although the English courts have, in our judgment, departed from sound principles, in holding that mere talk is a breach of a contract, despite the fact that the time for performance thereof has not arrived, yet they have not violated justice as well as legal principles by putting it in the power of the party to an agreement, who does not wish to fulfill it, to force a breach upon the other party before the day for performance has arrived, and thus escape the perhaps more serious consequences which might flow from a breach at the time of performance, by selecting such a season for a premature breach thereof as would make the damages comparatively light. In England the innocent party may treat a premature refusal to perform as a present breach, but he is not bound to do so. If he

elects to ignore such refusal, the agreement, so far as the question of the violation of it is concerned, stands precisely the same as though no word had been uttered by the other party. If anything occurs which would have released that party from the obligation of the agreement had he remained silent, he is released notwithstanding his premature repudiation thereof. It follows, too, that if then the then innocent party thereafter violates the contract the other party may take advantage of such violation of the agreement, just as he could have taken advantage of it had he not himself prematurely refused to respect the binding force of such agreement. All the adjudications which follow what may, for convenience, be denominated the "English doctrine," indorse this qualification of that doctrine, and it is repeatedly recognized by the English tribunals themselves. *Frost* v. *Knight*, L. R. 7 Exch. III; *Roebling's Sons' Co.* v. *Lock-Stitch Fence Co.*, 130 Ill. 660, 22 N. E. Rep. 518; *Kadish* v. *Young*, 108 Ill. 170; Lawson, Cont. § 440; *Zuch* v. *McClure*, 98 Pa. St. 541; *Avery* v. *Bowden*, 5 El. & Bl. 714; *Reid* v. *Hoskins*, Id. 729. In *Frost* v. *Knight*, Lord Chief Justice Cockburn said: "The law with reference to a contract to be performed at a future time, where the party bound to perform announces, prior to the time, his intention not to perform it, as established by the cases of *Hochster* v. *De La Tour* and *Harbour Co.* v. *Xenos*, [13 C. B. (N. S.) 825], on the one side, and *Avery* v. *Bowden*, *Reid* v. *Hoskins*, and *Barwick* v. *Buba*,²ᶜᴮ⁷⁶³ on the other side, may be thus stated: The promisee, if he pleases, may treat the notice of intention as inoperative, and wait the time when the contract is to be executed, and then hold the other party responsible for all the consequences of nonperformance. But in that case he keeps the contract alive for the benefit of the other party as well as his own; he remains subject to all his own obligations and liabilities under it, and enables the other party, not only to complete the contract, if so advised, notwithstanding his previous repudiation of it, but also to take advantage of any circumstance which would justify him in declining to complete it." We are therefore clear that, if plaintiff's letter of September

9th is to control, the contract was not broken September 7th.  The plaintiff in and by that letter elected to treat the contract as unaffected by the letter of September 7th written him by the defendants.  But it may be urged that other circumstances show that the plaintiff had elected on September 9th to treat the contract as broken by the defendants by their first letter, dated September 7th.  In his complaint the plaintiff alleges that he made the sale of the 5,000 bushels of flax in Duluth for the purpose of fixing at that time the amount of defendants' liability for damages, the price of the flax being at that time daily on the decline.  The averment of the pleading on this point is as follows:  "That immediately after the defendants had so repudiated the said agreement, and refused to accept the delivery of the said flax, and refused to pay for the same, as provided by and in the said agreement, and on or about the 7th day of September, A. D. 1895, the plaintiff, in order to protect the defendants against loss, as much as possible, in view of the facts and circumstances incident to the said agreement and the said breach thereof, the market price of flax being then daily on the decline, sold the said 5,000 bushels of flax at the best market price obtainable, and which he could obtain for the same."  Taking plaintiff's allegation in connection with this testimony, there is much to show that he had elected to proceed on the theory of a breach of the contract on September 7th, the day when the defendant's wrote their first repudiation of the agreement.  But the sale of the 5,000 bushels of flax in Duluth on September 9th does not purport to be a sale of the particular flax which plaintiff had contracted to sell the defendants, nor is there anything to indicate that plaintiff's purpose in selling it was to fix the defendants' damages, on the theory of a then breach of the contract, aside from his allegation in the complaint.  He never at any time disclosed to the defendants any such purpose, nor did he ever advise them at all that he had sold their flax.  On the contrary, he distinctly informed them in his letter of September 9th that he did not consider their letter of September 7th as a breach of the agreement, but that he certainly would expect them

to take the flax according to the contract. His election to ignore their premature refusal, and to treat the agreement as unaffected by anything they had said, is conclusively shown by his letter of September 9th; and thereafter the defendants might have recalled their refusal, and have proceeded with the performance of the agreement, despite anything the plaintiff might in the meantime have done. His undisclosed sale of the flax in Duluth could in no manner affect their right to hold him to his avowed purpose to regard the agreement as continuing in unimpaired force. Moreover, we should reach no different conclusions even if we should find that plaintiff had not in express terms asserted that he would not treat the contract as broken. We are confident in the soundness of our view that the English doctrine, that a refusal to perform a contract before the period of performance by either party has arrived constitutes a breach thereof, is violative of legal principles, and leads to most incongruous results. This point, however, we will discuss in a later portion of the opinion.

But it is strenuously urged that plaintiff cannot recover, because he has rescinded the contract, and also because he had himself broken it, while it remained unbroken by the defendants. The sale in Duluth is relied upon as establishing the rescission by him of the agreement. We are concerned in this case with only the question of rescission based on mutual consent. It is not a case where one party has the right to rescind an agreement for the fraud of the other, or for other legal reasons of like character. When one party to an agreement has violated its obligations in a particular that goes to the root of the agreement, then it is true that the other party may treat his conduct as an offer to rescind, and may acquiesce in the desire so manifested to abandon the contract. In such a case the parties unite in a mutual release of the obligations which reciprocally bind them. So, too, when one party to an agreement expresses, even before the time for performance has arrived, his desire to escape the burdens of the agreement, he thereby offers to discharge the other party from the obligations thereunder resting upon him; and such party may

treat such conduct as an overture for rescission, and assent thereto. Doubtless, the plaintiff, after receiving from the defendants their letter of September 7th, might have written them that he considered the contract as canceled, and thereafter it would have been forever extinguished for all purposes. Possibly he might have rescinded without performing any overt act, or making any statement to manifest his purpose. But that he never intended to rescind the agreement is too clear to admit of doubt. His letter of September 9th shows that he had no thought of rescinding, and thereby releasing defendants from liability. So do the allegations of his complaint. Although his letter is inconsistent with the averments of his pleading that he sold the flax on a theory of a present breach of the contract, yet it is to be noticed that nowhere does he assent to a rescission thereof. His attitude is at all times that he will rigidly hold the defendants to the obligations of their agreement. In his letter he tells them that he will hold them to it, by his statement that he will insist upon performance on their part. In his pleading he alleges that he intended to hold them to it when he sold the flax in Duluth, for he sold it with the express purpose of fixing their damages for a breach thereof. However much he may have been mistaken as to his legal right to sell at that time, and in the manner in which the sale was made, for the purpose of fixing the measure of damages, he clearly never meant to acquiesce in the repudiation of the contract by the defendants, and thus assent to a rescission thereof. But if, while the agreement remained in full force, the plaintiff himself violated its terms, then it is obvious that the defendants may take advantage of this breach as a perfect defense. They may elect to treat his breach of contract as warranting a rescission thereof by them, or they may consider it as a breach, rendering him liable for damages. In either event they would have a perfect defense to this action. It is therefore necessary to determine whether, by the sale of the flax in Duluth on the 9th of September, the plaintiff himself violated his agreement to deliver the flax to the defendants. It is not pretended that he

violated it in any other manner. The plaintiff did not agree to deliver any particular 5,000 bushels of flax to the defendants. All that he was called upon to do, to fulfill his obligation, was to deliver the specified number of bushels of flax, of the quality and grade designated in the contract, without reference to the place where it was raised, or the question whether it was owned by the plaintiff at the time the agreement was entered into. But it is said that it appears from the plaintiff's testimony that he segregated 5,000 bushels of flax from the common mass of the flax raised by him on his farm, and then sold that particular flax in Duluth, as being the identical property he had agreed to sell the defendants. It is true that he speaks of selling the same flax that he had agreed to deliver to the defendants, and the allegations of his complaint are to the same effect. But it is evident that the segregation of this flax was purely mental. He did not in fact set apart any particular 5,000 bushels as the property he had obligated himself to deliver to the defendants, and then agree to sell the same property in Duluth. At that time none of his flax had even been threshed. But even if we should assume that plaintiff had actually set apart a particular 5,000 bushels as the flax he was subsequently to deliver, and that thereafter he had sold and delivered it to a third person, this would not of itself constitute a breach of his contract. The selection by the vendor of the property he intends ultimately to deliver under a contract is not irrevocable, where he has the choice, and the vendee does not unite with him in such selection. Despite the fact that the vendor has set apart the property as the particular property he will finally deliver, he may change his mind before the time for delivery arrives, and substitute other property in place of that which he had tentatively selected. The vendee acquires by such an *ex parte* selection no vested right to insist that that is the particular property which must be delivered to him by the vendor to fulfill the conditions of the contract. All he can demand is that, when the time for performance arrives, property of the descrip-

tion and quality specified in the agreement shall be delivered to him. The implied understanding of the parties is that the vendor shall have until the day for performance to determine what specific property he will deliver. Any selection made by him before that time is revocable by him. The rights of the vendee are in no manner affected by such selection, or by the vendor's change of mind. He has no cause for complaint, provided, at the time prescribed in the agreement, property of the kind and quality of the property therein specified is delivered to him in strict accordance with the provisions thereof, whatever vacillations of purpose may have characterized the conduct of the vendor in the meantime. Should a grocer, receiving from a customer an order for a barrel of flour of a particular brand, to be delivered the following day, select, in the absence of such customer, a barrel from a number of barrels in stock, and direct that that barrel be taken to the customer's house the next day, it certainly would not be a breach of the contract for him subsequently to sell it and substitute another barrel in its place; the sale and substitution both taking place before the time for delivery according to the agreement had arrived. Indeed, it is questionable whether a sale and delivery of property by the vendor before the day for delivery under an executory contract has been reached is a breach of such contract, even in cases where the specific thing to which the contract relates is agreed upon by the parties. If A. agrees to sell and deliver to B. at the end of 30 days, a particular horse, for a price named in the contract, can it be said that A. has put it out of his power to perform the agreement by selling and delivering to C. the same animal 20 days before B. can call for the performance of the contract by A.? How can B. say, without possibility of error, that A. will not be able to perform his agreement when the time for performance arrives? May not A. repurchase the horse in time to fulfill his compact with B.? See opinion of Denman, C. J., in *Lovelock* v. *Franklyn*, 8 Q. B. 371; 2 Pars. Cont. 666, 667. But see *Heard* v. *Bowers*, 23 Pick. 460. Besides, on what principle can be based the doctrine that the certainty that a party

will not be able to perform his agreement when performance by him is due is equivalent to a present breach of the contract, although, as a matter of fact, he has not violated, and cannot violate, the contract until the future day for fulfillment has been reached ? It is by no means certain that the fact that a party has put it out of his power to perform a contract when the day of performance has arrived is a breach thereof, or whether the utmost effect of such an act is merely to make inevitable a future breach of the agreement. Neither can it be said in every case that the bare fact that the vendor in an executory contract of sale has, before performance is due, sold the very property to which the executory contract relates, demonstrates the certain inability of the vendor thereafter to make delivery in the future in accordance with the terms of his promise.

But in the case at bar it does not even appear that the plaintiff had sold the flax he had agreed to sell to the defendants. The second contract, like the first, was executory. It was an agreement which by its very terms was not to be performed until after the time for performance of the contract with the defendants had passed. The Duluth contract provided for delivery in October. It is therefore clear that plaintiff had not divested himself of the title to the flax, or agreed to deliver possession thereof to the Duluth parties at any time prior to the time for delivery to defendants under his contract with them. And it is an undisputed fact that he did not deliver any of such flax to the Duluth parties until long after the day for delivery to the defendants had passed. Indeed, all the flax called for by the Duluth contract had not been delivered at the time this case was tried. It is therefore apparent that, during the entire period between the making of the contract with the defendants and the time for performance thereof according to its terms, the plaintiff had not parted with the title to or possession of the 5,000 bushels of flax, even assuming that the contract with defendants related to a particular 5,000 bushels. Conceding that the two contracts both related to the same property, yet it is obvious that it cannot be said that the mere fact

that plaintiff could not fulfill his agreement with defendants without being guilty of a breach of contract with the Duluth parties establishes the proposition that he had placed it beyond his power to carry out his agreement with the defendants. He was absolutely master of the situation. He could break either contract he saw fit to break, and perform either contract he saw fit to perform,—subject, of course, to legal liability for such breach. But it was not even necessary for him to violate his agreement with the defendants in order to fulfill his contract with the Duluth parties, even assuming that he had agreed to sell a particular 5,000 bushels to the defendants, and had in mind the same flax when he made the Duluth contract. In that contract he did not bind himself to deliver any particular 5,000 bushels of flax, but, on the contrary, to deliver any 5,000 bushels, of a certain grade, which he might tender in fulfillment of the contract. He may have considered that he was selling the 5,000 bushels he had agreed to sell the defendants, and yet he did not bind himself to sell only this flax to the parties in Duluth. At no time, therefore, did he divest himself of the title to the particular flax he had agreed to sell to defendants, assuming the specific flax to have been pointed out, or the possession thereof, or bind himself to sell it at all to the parties in Duluth.

When plaintiff wrote to defendants, on September 9th, stating that he would give them further time to consider their refusal to recognize the contract, his attitude was that he did not elect to treat their first letter, to which his letter was in answer, as constituting a breach of the contract. But he did not thereby bind himself not to consider any subsequent repudiation by them of the agreement as a violation thereof. Accordingly we would be compelled to hold that, on the receipt of their second letter, plaintiff was in a position to insist that defendants had broken the contract, if we should adopt the English rule. As before indicated, we deem it indefensible on principle, nor are we able to discover how it subserves business convenience, or in what respect it is more just than the contrary doctrine. In the country in

which it had its origin, it was not at first recognized as the correct rule of law. In *Phillpotts* v. *Evans*, 5 Mees. & W. 475, Parke, B., said: "The notice that he will not receive the wheat amounts to nothing, until the time when the buyer ought to receive the goods, unless the seller acts on it in the meantime, and rescinds the contract." "I think no action would have then lain for the breach of the contract, but that the plaintiffs were bound to wait until the time arrived for the delivery of the wheat, to see whether the defendants would then receive it." In *Leigh* v. *Paterson*, 8 Taunt. 540, the defendant had until December 31st in which to deliver the goods contracted for. On October 1st he notified plaintiff that he would not carry out his contract. The question was whether the market value of the goods on October 1st or December 31st should be taken into consideration in fixing the plaintiff's damages. The court ruled that the value on December 31st was the value to be ascertained in determining the damages, and the decision was placed on the ground that, despite the premature repudiation of the contract by the defendant, he might thereafter have delivered the property, at any time up to December 31st. Dallas, C. J., said: "The defendant had a right to deliver the tallow at any time before 12 o'clock at night on the 31st of December." Parke, J., said: "The defendant might have delivered the tallow any moment up to the 31st of December, and the price on that day should have regulated the verdict of the jury." In *Ripley* v. *McClure*, 4 Exc. 359, the court said, in reference to the contention of counsel for defendants that the refusal on the part of the defendants to accept the goods, the refusal being made before the time for performance had arrived, was no more than an expression of intention, which could be retracted: "And we think that, if the jury had been told that a refusal before the arrival of the cars was a breach, that would have been incorrect. We consider that point rightly decided in *Phillpotts* v. *Evans*, 5 Mees. & W. 475." Mr. Benjamin, in his work on Sales, declares that "the date at which the contract is considered to have been broken is that at which the goods were to have been

delivered, not that at which the buyer may give notice that he intends to break the contract and to refuse accepting the goods." Volume 2, § 1118. In the very case in which the modern English doctrine was first promulgated (*Hochster* v. *De La Tour*, 2 El. & Bl. 678), Lord Campbell clearly recognizes the general rule that until the time for performance has arrived there can be no breach, by the assertion that it is not the universal rule, and by proceeding to point out the exceptions to it. He seems to have treated the case before him as an exception to the general rule. And in *Frost* v. *Knight*, L. R. 7 Exch. 111, 114, Lord Chief Justice Cockburn declares, in so many words, "that there can be no actual breach of the contract, by reason of non-performance, so long as the time for performance has not yet arrived." In *Roper* v. *Johnson*, L. R. 8. C. P. 167, the doctrine laid down in *Hochster* v. *De La Tour*, is spoken of as a novel doctrine. While the court in *Frost* v. *Knight*, L. R. 7 Exch. 111, treats the rule enunciated in *Hochster* v. *De La Tour*, as settled law, yet when *Frost* v. *Knight* was before the court of exchequer the majority of that court (Kelly, C. B., and Channall, B.) vigorously assailed the anomalous doctrine which was applied in the Hochster case. See L. R. 5 Exch. 322. It is so obvious that, unless some obligation is violated by a party, he cannot be said to have broken his contract, that Lord Chief Justice Cockburn in *Frost* v. *Knight*, was obliged to assume, in order to support his reasoning in that case, that there was an implied understanding that neither party should sever the contractual relation, and that the premature refusal to perform was a violation of this implied understanding. The lord chief justice says: "The promisee has an inchoate right to the performance of the bargain, which becomes complete when the time for peformance has arrived. In the meantime he has a right to have the contract kept open as a subsisting and effective contract. Its unimpaired and unimpeached efficacy may be essential to his interests. His rights acquired under it may be dealt with by him in various ways for his benefit and advantage. Of all such advantage the repudiation of the contract by the

other party, and the announcement that it will never be fulfilled, must, of course, deprive him. It is therefore quite right to hold that such announcement amounts to a violation of the contract in omnibus, and that upon it the promisee, if so minded, may at once treat it as a breach of the entire contract, and bring his action accordingly." But that is a strange mode of reasoning which assumes a breach for the purpose of establishing a breach. Lord Cockburn asserted that the contractual tie was severed, for the purpose of proving that the contract had been violated. Unless the contract calls for a continuance of the willingness of a party to perform it during all the time between the execution thereof and the day of performance, his mere expression of a purpose not to fulfill its obligation is not a breach of such contract. But what interest has a vendor in a contract for the sale of property in the unchanged purpose of the vendee to carry out the agreement? The only matter which concerns him is the willingness of the vendee at the time specified in the contract to  accept and pay for the property. There is always the possibility that either party to an agreement may violate it when performance by him is due. This possibility is not converted into a certainty by his premature refusal to fulfill its obligations. He may repent of his hasty decision. After such an anticipatory disavowal of the contract, there still remains, as before, the possibility both of ultimate performance and of ultimate violation of the agreement by the one who has threatened, but only threatened, to ignore it. By a premature repudiation the rights of the other party are not in any degree affected. He still has a right to insist upon the performance of the agreement at the appointed time, or that the other party shall pay damages for the breach of the contract. This was the extent of his right before the other party had spoken a word inimical to the agreement, and he continues to enjoy this right despite such premature repudiation.

How it can be asserted, as Lord Chief Justice Cockburn asserted in *Frost* v. *Knight*, that the premature repudiation of a contract deprives the other party of all advantage under it, is

inexplicable. He, in the very same opinion, declared that the innocent party, so far from being deprived of any advantage, ·could elect to treat the agreement as unimpaired. The warning, which leaves the agreement unaffected, is a positive benefit, and not a detriment, to the other party. Should the would-be violator of the agreement keep his purpose to himself, the other party would be in a situation not so favorable. Suppose, for instance, that the vendor had agreed to sell property, fluctuating in value, at a specified time. He may discover subsequently to the making of such contract that the vendee has become insolvent and does not intend to perform the agreement; yet so long as such vendee keeps silent the vendor is obliged to stand to the agreement, taking all the risk that, if the market should turn against him at the time for delivery, he must lose, and yet knowing that, if the market should prove favorable to him, the vendee will break the contract, and leave him (the vendor) only a worthless cause of action for damages against a bankrupt. Under such circumstances a statement by the vendee that he will not carry out the contract would place the vendor in a more favorable position, for it would enable him, at his option, to rescind the contract, thus escaping the risk of loss in a case where he could not hope to reap any benefit from the agreement should the market be favorable to him at the time for performance. The fundamental inquiry is, of course, in every case, whether any essential provision of the contract, either express or implied, has been violated. If the agreement is for the sale of property at a fixed time in the future, the intermediate expression by either party of a purpose not to stand by the contract is not a breach thereof, because he has not thereby done anything in violation of his promise, to the detriment of the other party. But, if the contract is to marry at a future date, a different case is presented. The agreement to marry connotes the further agreement to remain affianced until the performance of the contract has established the still closer relation of husband and wife. Such an agreement establishes a distinctive relation, known as "betrothment." He who destroys

this relation—though it be done before the period of marriage has, under the terms of the contract, arrived—violated the contract in a vital element; and the violation is none the less actionable because the promise to remain engaged in the meantime is implied, and not expressed. The contract is an entirety, and, when broken, is broken in its entirety. It is on this ground that the decision in *Frost* v. *Knight*, L. R. 7 Exch. 111, 114, is placed by the lord chief justice. He says: "It is next to be observed that the law, as settled by *Hochster* v. *De La Tour*, and *Harbor Co.* v. *Xenos*, is obviously quite as applicable to a contract in which personal status or personal rights are involved as the one relating to commercial or pecuniary interests. Indeed, the contract of marriage appears to afford a striking illustration of the expediency of holding that an action may be maintained on the repudiation of a contract to be performed *in futuro*. On such a contract being entered into, not only does a right to its completion arise, with reference to domestic relations, and possibly pecuniary advantages, as also to the social status accruing on marriage, but a new status—that of betrothment—at once arises between the parties. This relation, it is true, has not, by the law of England, the same important consequences which attach to it by the canon law, and the law of any other country. Nevertheless, it carries with it consequences of the utmost importance to the parties. Each becomes bound to the other. Neither can, consistently with such a relation, enter into a similar engagement with another person. Each has an implied right to have this relation continued until the contract is finally accomplished by marriage." And Byles, J., concurs in the judgment of the court on the ground that the implied agreement to remain betrothed until marriage had been violated. He says: "An express precontract of marriage, as already suggested by the lord chief justice, places the man and woman in the condition or status of betrothment. In this state there are certain mutual duties. The woman, for example, may not, without a breach, marry another man, although it is possible that he may die before the future day

appointed for the first intended marriage, whether already fixed, or whether contingent on a future event. So, I conceive, the man cannot, during the stipulated period of betrothment, without a breach of contract, marry another woman, though she may die in the meantime. So for one of the parties to break off the mutual engagement, by an express refusal to perform it, though before the day, seems to me to be equally a breach of the contract; for it puts an end to the condition of betrothment, which, according to the contract, was to continue. In each of these three cases there is a repudiation of the duties springing from the new relation involved in the contract."

A review of the English decisions will disclose the fact that only in a single case has this modern English doctrine been applied where the enforcement of a contrary rule would have led to a different decision. This is *Hochster* v. *De La Tour* (decided in 1853) 2 El. & Bl. 678. In that case it appeared that the plaintiff and defendant, in April, 1852, had entered into a contract of service. The plaintiff was to serve the defendant, as a courier in his travels on the continent, for a period of three months, commencing June 1, 1852. On the 11th day of May, 1852, defendant notified plaintiff that he would not perform the agreement, and on the 22d of the same year the action to recover damages for breach of the contract was commenced. The question was squarely raised, by the contention of counsel for the defence, whether what had been said by the defendant constituted a present breach of the agreement. The court of queen's bench held that it did. Lord Campbell says: "The defendant's counsel very powerfully contended that, if the plaintiff was not contented to dissolve the contract, and to abandon all remedy upon it, he was bound to remain ready and willing to perform it until the day when the actual employment as courier in the service of the defendant was to begin, and that there could be no breach of the agreement before that day, to give a right of action. But it cannot be laid down as a universal rule that where, by agreement, an act is to be done on a future day, no action can be brought for a breach of

the agreement until the day for the doing of the act has arrived."
"If a man promises to marry a woman on a future day, and before
that day marries another woman, he is instantly liable for an
action for breach of promise of marriage. *Short* v. *Stone*, 8 Q. B.
358. If a man contracts to execute a lease on and from a future
day, for a certain term, and before that day executes a lease to
another for the same term, he may be immediately sued for
breaking the contract. *Ford* v. *Tiley*, 6 Barn. & C. 325. So, if a
man contracts to sell and deliver specific goods on a future day,
and before the day he sells and delivers them to another, he is
immediately liable to an action, at the suit of the person with
whom he contracted first to sell and deliver them. *Bowdell* v.
*Parsons*, 10 East, 359. One reason alleged in support of such an
action is that the defendant has before the day rendered it impos-
sible for him to perform the contract at the day. But this does
not necessarily follow, for prior to the day fixed for doing the
act the first wife may have died, a surrender of the lease executed
might be obtained, and the defendant might have repurchased
the goods, so as to be in a situation to sell and deliver them to
plaintiff. Another reason may be that, where there is a contract
to do an act on a future day, there is a relation constituted between
the parties that in the meantime neither will do anything to the
prejudice of the other inconsistent with that relation. As an
example, a man and woman engaged to marry are affianced to
one another during the period between the time of the engage-
ment and the celebration of the marriage. In this very case of
traveler and courier, from the day of the hiring until the day
when the employment was begun they were engaged to each
other, and it seems to be a breach of an implied contract if either
of them renounced the engagement." "The man who wrongfully
renounces a contract into which he has deliberately entered can-
not justly complain if he is immediately sued for a compensation
in damages by the man whom he has injured; and it seems
reasonable to allow an option to the injured party, either to sue
immediately, or to wait until the time when the act was to be

done,—still holding it as prospectively binding for the exercise of this option, which may be advantageous to the innocent party, and cannot be prejudicial to the wrongdoer." So far as the lord chief justice could perceive an analogy between the engagement between the plaintiff and defendant in that case and an engagement between a man and a woman who are betrothed, his faculty for discovering similitudes is certainly phenomenal. The balance of his reasoning is that the rule that is there laid down is more convenient than the other rule, which squares with legal principle. There is a tacit confession through this entire discussion of the question that the decision is at war with settled principle. And in *Frost* v. *Knight*, also, the argument of convenience appears to have had a great weight with Lord Chief Justice Cockburn. In *Dugan* v. *Anderson*, 36 Md. 567, the court, while not deciding the question, seems to have been governed in the utterance of its dictum on the subject by considerations of convenience. We agree with the Massachusetts Supreme Court that the argument of convenience should have no weight as against the demands of legal principle. In *Daniels* v. *Newton*, 114 Mass. 530, the court said: "Much argument is expended in both cases upon the ground of convenience and mutual advantage to the parties from the rule sought to be established. But before that argument can properly have weight, the point to be reached must be first shown to be consistent with logical deductions from the strictly legal aspects of the case. The legal remedy must be founded on some principle, and must conform to the nature of that right. Until the plaintiff has either suffered loss or wrong in respect of that which has already vested in him in right, or has been deprived of, or prevented from acquiring, that which he is entitled to have or demand, he has no ground on which to seek a remedy by way of reparation. The conduct of the defendant is no wrong to the plaintiff until it actually invades some right of his. Actual injury, and not anticipated injury, is the ground of legal recovery. The plaintiff's rights are invaded by repudiation of the contract only when it produces the effect of non-performance, or prevents him

from entering upon or complying with performance on his part at a time when, and in the manner in which, he is entitled to perform it, or have it performed." And in *Frost* v. *Knight*, L. R. 7 Exch. 111, Lord Cockburn declared that the argument founded on convenience should not control, but should be considered only in connection with arguments founded on settled doctrines of the law. He, however, was able to discover, as we have already pointed out, a basis for the English rule in elementary principles; but we are unable to agree with him in this respect, and, such being the case, we have his authority for rejecting the argument of convenience when it stands alone as the supporter of this novel rule. Moreover, we are unable to see wherein business convenience is subserved by the English doctrine. It is subserved  thereby only on the theory that to establish a rule for the special advantage of the party who does not proclaim his purpose to violate the contract is to advance the convenience of the business world. The option, under such doctrine, is with such party to treat the premature declaration as a breach of the agreement, or to refuse to so treat it. He may decline to consider it a breach, and hold the other party to the contract, the same as though no word inimical thereto had been spoken. Under the guise of furthering business interests, the English rule unfairly discriminates against the party who speaks, and in favor of the one who is silent. The latter may secretly intend not to carry out the agreement. The former may be actuated—indeed, he often is prompted—by the laudable motive of giving the other party timely warning of what he deems at the time his inevitable inability to perform the agreement. On what principle of justice, then, should the law thus discriminate between the parties ? If this rule be adopted, then it will not infrequently happen that a party has been held liable for a breach for merely admonishing the other party that a breach is inevitable, when, had he remained silent, no liability could have been enforced against him, because the contract would have been extinguished before the day for performance could arrive, by reason of the death of one of the

parties thereto,—the contract being for personal services,—or because of the destruction before that day, without the fault of anyone, of the subject-matter of the agreement. By being allowed to treat the agreement as broken, the party can enforce a liability for substantial, and perhaps very heavy, damages, whereas, if he had been forced to wait until it should be ascertained whether the other party would in fact perform his agreement, the damages then would have been merely nominal, or the latter might have escaped all liability, by reason of the extinguishment of the contract before the day of performance arrived, for the reasons already mentioned. Indeed, the party who sues might himself have been unable to perform when the time for performance was reached, and might have been put in default by demand of the other party that the agreement be carried out. If the doctrine of the Hochster case be sound, then one who has agreed to enter the service of another two years in the future may elect to treat as a breach of the contract an immediate refusal by the employer to fulfill the same, and he may then sue, and the case may be tried before the period for entering upon the discharge of his duties under the contract has arrived. In such a case he would recover full wages, it being impossible to show what he had earned or could have earned during the time he was to have worked for the defendant. And yet subsequent developments may reveal the fact that, so far from being damaged, he was positively benefitted, by the fact that he did not enter the defendant's employ. He may during that period earn double the wages he was to have received under the contract, and this, too, in addition to that which he has already collected without doing a stroke of work therefor. Nay, the death of the employer before the day for commencing the performance of the agreement arrives, working an extinguishment thereof, may show that but for his statement the plaintiff could never have collected a dollar. Undoubtedly the party to whom the refusal is communicated may treat it as an overture for a consent by him to rescission, and rescind the contract. But he has no right to construe as a present

breach words which only disclose the probability of a future breach.

Many of the cases which appear to support the doctrine of the Hochster case are distinguishable on this ground of rescission. It will be found on an analysis of them that all that the party to the contract was seeking to do by his action was to recover on a *quantum meruit*, on the theory that he had rescinded the contract on being informed by the other party that he did not intend to carry it out. The court did not in these cases hold that the contract was broken, but merely that, it having been rescinded by mutual consent, the party who had parted with anything of value in the performance of the agreement could recover the value thereof, on an implied promise to pay the same. In *Planche* v. *Colburn*, 8 Bing. 14, the plaintiff had a contract with the publishers of a periodical to write a series of articles therefor. The publishers having discontinued the publication, he treated their conduct as justifying a rescission, and rescinded the contract. The action was to recover the value of work already performed by him, at defendant's request, in writing a portion of the articles. It was on this theory that a recovery was sustained. In some of the cases, the party to whom the notice of refusal was given had the option to call for a performance at any time; and, of course, he could elect to regard the time of performance as having arrived, and then treat the refusal as a waiver of tender of performance, and in this way hold the party as for a present breach of the agreement. This element existed in the following cases: *Lovelock* v. *Franklyn*, 8 Q. B. 371; *Bowdell* v. *Parsons*, 10 East, 359; *Newcomb* v. *Brackett*, 16 Mass. 161; *Windmuller* v *Pope*, 107 N. Y. 674, 14 N. E. Rep. 436; *Short* v. *Stone*, 8 Q. B. 358. Of the English cases, we have seen that *Phillpotts* v. *Evans*, 5 Mees. & W. 475; *Ripley* v. *McClure*, 4 Exch. 345; and *Leigh* v. *Paterson*, 8 Taunt, 540; are opposed to the Hochster case. Mr. Benjamin, also, in his work on Sales (an English work), states the rule the other way, as we have already seen. 2 Benj. Sales, § 1118. In *Lovelock* v. *Franklyn*, 8 Q. B. 371, Lord Denman intimated that,

where the time of performance is fixed, the fact that a party has in the meantime incapacitated himself from performing the contract will not constitute a breach thereof. *Frost* v. *Knight*, L. R. 7 Exch. 111, was·an action for breach of promise to marry, and stands, as we have seen, on peculiar grounds, not applicable to actions for breach of contract generally. And in the court of exchequer the doctrine in the Hochster case was powerfully assailed by the majority of the court. L. R. 5 Exch. 322. *Short* v. *Stone*, 8 Q. B. 358; was also such an action. In this case the defendant had not only broken the engagement, but had actually married another person. *Planche* v. *Colburn*, 8 Bing. 14, was not an action for breach of contract, but to recover on the theory of a rescission. In *Harbour Co.* v *Xenos*, 13 C. B. (N. S.) 825, the action was not brought until after the time for performance had arrived. The defendant never retracted his premature refusal. Therefore, all the court was called upon to decide in that case was that when the day for fulfillment of the agreement was reached the unwithdrawn refusal was·a waiver of tender of performance by the plaintiff, and enabled it to sue for breach of contract, the same as though such tender had then been made and refused. There was no occasion for alluding in this case to the doctrine laid down in the Hochster case. In *Avery* v. *Bowden*, 5 El. & Bl. 714, and *Reid* v. *Hoskins*, Id. 729, the court held that the plaintiff could not recover, because he had declined to treat the premature refusal of the other party as a breach. The same result was reached in these cases that would have been reached if the doctrine we believe to be sound had been applied. In *Roper* v. *Johnson*, L. R. 8 C. P. 167; and *Brown* v. *Muller*, L. R. 7 Fxch. 319, we observe the practical working of the rule promulgated by the Hochster case. Having violated legal principles once, in deciding that case, the courts were forced to violate them a second time, in laying down the rule relating to the measure of damages in such cases. Instead of fixing the value at the time of the premature breach as the element to be considered, the court held that the value at the time for performance, as fixed by the

agreement, must be considered. In *Roper* v. *Johnson*, the court, after speaking of the doctrine of the Hochster case as a novel doctrine, says: "The difficulty which presents itself here is introduced by the comparatively recent case of *Hochster* v. *De La Tour*, the first case which decided that in the case of an executory contract the refusal of one party to perform the contract would justify the other in at once treating such refusal as a breach and suing for damages. That case has been distinctly recognized on subsequent occasions, and we must now assume it to be the law. It has undoubtedly introduced a difficulty in the assessment of damages in similar cases." Judge Keating, after referring to the rule the court would adopt in that case as to the proper measure of damages, said: "I think it is the better and the safer rule, though I am free to confess that the matter is by no means divested of difficulty,— a difficulty occasioned by the novel doctrine introduced by the case of *Hochster* v. *De La Tour*." It must be admitted that the case of *Ford* v. *Tiley*, 6 Barn. & C. 325, strongly supports the decision in the Hochster case.

In this country there appears, from a superficial view of the decisions, to be a great mass of authority in favor of the English doctrine. But a review of adjudications on this side of the water will reveal the fact that there is very little in the way of express authority in America upholding the English rule. The case of *Burtis* v. *Thompson*, 42 N. Y. 246, may be dismissed with the observation that it was an action for breach of promise to marry. In *Howard* v. *Daly*, 61 N. Y. 362, there is a dictum by Commissioner Dwight that the doctrine ia the Hochster case is sound. But the facts did not call for any decision on this point, as the defendant had refused to alllow the plaintiff to enter upon the performance of her contract of service after the time for performance had arrived. The other members of the court expressly refused to state their views whether the English rule could be sustained in principle. See page 378. In *Bunge* v. *Koop*, 48 N. Y. 225, all the court decided was that a premature refusal, unre-

tracted, constitutes a waiver of tender of performance, when the time to fulfill the contract arrives, and that thereafter the plaintiff may sue for breach without showing an offer to perform. In *Freer* v. *Denton*, 61 N. Y. 496, and *Shaw* v. *Insurance Co.*, 69 N. Y. 293, the court expressly refused to determine whether the English rule should be followed. In *Ferris* v. *Spooner*, 102 N. Y. 10, 5 N. E. Rep. 773, the defendant had broken his contract after he had entered upon the performance thereof. The court said: "When, therefore, he repudiated the further performance of the contract, the plaintiff was discharged from all obligation to either, and set at liberty to enforce his securities for the money already advanced. Obviously, demand of payment was not essential to a cause of action." In *Windmuller* v. *Pope*, 107 N. Y. 674, 14 N. E. Rep. 436, the court appears to have recognized the English rule but the case does not show whether the suit was brought before or after the day for performance had arrived. Moreover, the time for the vendors to commence delivery by shipment of the property agreed to be sold had arrived at the time the vendees had declared their purpose not to accept the property under the contract. The vendors appeared to have had an option to deliver at any time between certain dates. When the vendees repudiated the agreement, the time when the vendors might have insisted upon delivery had arrived, although they could, at their option, have made delivery at a later date. The vendors having a right to begin performance at the time the vendees refused to receive the property, the former might, of course, treat the repudiation as a breach. It was not a premature repudiation of the contract, but one which occurred after the time had arrived when the vendors had a right to insist on performance thereof. \All that the court held in *Crist* v. *Armour*, 34 Barb. 378, was that a premature refusal, unwithdrawn at the time for performance, was a waiver of an offer of performance at that time. In *Donovan* v. *Sheridan*, (Super. N. Y.) 24 N. Y. Supp. 116, it appeared that the point that a premature repudiation was not a breach was not made at the trial, and the court declared that therefore it would not be

considered.  But the court did utter a dictum in favor of the
English rule.  However, it was based on New York decisions
which had not at that time, at least, settled the law in that state
in favor of such rule.  In *Gray* v. *Green*, 9 Hun. 334, the court
said:  "The effect of a mere refusal has been stated to be that if,
before the time arrives at which a party is bound to perform a
contract, he expresses an intention to break it, this of itself does
not amount to a breach thereof; but, if such expression of inten-
tion remains unretracted when the time arrives for the other
party to perform his part of the contract, this fact will dispense
with such performance."  In *Crabtree* v. *Messersmith*, 19 Iowa,
179, the defendant broke the contract of sale after the time for
performance had arrived, by returning the property, after posses-
sion thereof had been delivered to him.  While the English rule is
referred to, it is obvious that no question of premature breach
was involved.  In *Holloway* v. *Griffith*, 32 Iowa, 409, the action
was for breach of promise to marry, and the case therefore
belongs to the class of cases in which a premature refusal oper-
ates as a breach of the implied agreement to continue betrothed
until marriage.  In *Roebling Sons Co.* v. *Lock-Stitch Fence Co.*, 130
Ill. 660, 22 N. E. Rep. 518, the defendant refused to perform
after it had entered upon the performance of the agreement.  In
*Kadish* v. *Young*, 108 Ill. 170, the court held that the premature
refusal to perform was not a breach, because the other party to
the contract had not elected to treat it as a breach.  The same
result would have been reached in that case if the English doc-
trine had not been applied.  In *Fox* v. *Kitton*, 19 Ill. 519, all the
court decided was that the innocent party may treat a premature
repudiation as an offer to rescind the agreement.  In *Chamber of
Commerce* v. *Sollitt*, 43 Ill., 523, it appeared that, while the defend-
ant announced his inability to perform before the time for
performance arrived, yet he did not withdraw such refusal to
carry out the agreement before such time, and the suit was not
brought until the period for fulfillment of the agreement had
come and passed.  In *Follansbee* v. *Adams*, 86 Ill. 14, the parties

to the contract, after one of them (the plaintiff) had notified the other (the defendant) that he could not perform, adjusted the matter, and on his adjustment it was agreed that· plaintiff owed defendant a certain sum. Thereafter, plaintiff having sued defendant for failure to perform the contract, this settlement was pleaded as a defense. Of course, it was held that it constituted a perfect defense to the action. The contract was, by the act of the party, extinguished before the time for performance arrived. How could there thereafter be any liability thereunder? The court was not called upon to decide whether the plaintiff, by his premature refusal, had broken the agreement. The principle on which the decision rests is that the parties to a contract may, even before performance is due, extinguish it. The scope of the decision is disclosed in the last sentence of the opinion, "We are satisfied, after careful consideration of the whole record, that the court decided right in holding the contract rescinded." In _Railway Co._ v. _Richards_, (Ill. Sup.) 38 N. E. Rep. 773, the breach consisted of acts in contravention of the terms of the contract after the time for performance had arrived. The court, indeed, indorses the English doctrine, but what was said on the subject was pure dictum. In _Zuch_ v. _McClure_, 98 Pa. St. 541, the court held that a premature repudiation did not constitute a breach, as the innocent party did not elect to so regard it. The result in this case would have been the same if the English rule had not been adopted. In _Heard_ v. _Bowers_, 23 Pick. 455, the court inti mated that, if a party voluntarily puts it out of his power to perform a contract before the day of performance arrives, he by that act breaks the agreement. See page 460 In _Dingley_ v. _Oler_, 11 Fed. Rep. 372, the court applied the English doctrine; and when this case was decided on appeal in the Federal Supreme Court (117 U. S. 490, 16 Sup. Ct. 850), that court intimated that it con- sidered the English doctrine as sound, but the decision below was reversed on the ground that, even assuming that doctrine to be preferable, the facts did not bring the case within it, for the reason that no distinct repudiation of the agreement before the

time for performance had been shown. In the case of *U. S. v. Smoot,* 15 Wall. 36, the court, while leaning very decidedly towards the English rule, held that the case was not brought within its scope, for the same reasons which govern the decision in that court in *Dingley* v. *Oler.* In *Dugan* v. *Anderson,* 36 Md. 567, the court, while not called upon to settle the question, indicated that, on the score of convenience, it might, when called upon to settle the point, adopt the English rule. But, as we have already seen, it is indefensible to rest the English doctrine upon the mere ground of convenience, and in this case it appeared that the contract was broken while it was being performed. In *Hosmer* v. *Wilson,* 7 Mich. 294, the action was brought to recover the value of labor expended on materials out of which an engine was to be constructed by plaintiff in error for defendant in error. The defendant in error had repudiated the contract while plaintiff in error was performing it. Of course, this was a breach of the agreement. No question of premature repudiation was involved. In *Platt* v. *Brand,* 26 Mich. 175, it would seem that the plaintiff, against whom the defendants sought to set up, by way of recoupment, a claim for damages for a breach of contract to furnish glass, had broken the contract after performance thereof had been entered upon, although at a time anterior to the time when delivery of the installment which he refused to deliver was due. In *Wolf* v. *Marsh,* 54 Cal. 228, it appeared that the written instrument sued upon was given on condition that it was not to be enforced until a certain mine should yield a profit to the defendant, and that, if it should not yield a profit to him, the instrument was to be void. The defendant sold the mine, and the court held that the instrument at once became enforceable. By the act of sale the defendant had put it out of his power to make the mine yield a profit to him, and the court therefore very properly held that the instrument could be enforced without waiting future developments. In *Sullivan* v. *McMillan,* (Fla.) 8 South. 450, the refusal to go on with the contract was made after performance thereof had been entered upon. Therefore no question of pre-

mature refusal was involved. The court did not adopt the English doctrine. On the contrary, it stated that the case did not call for a decision on that point. The court said: "The case at bar does not, however, call for an expression of opinion, as between the doctrine of *Hochster* v. *De La Tour* and that of *Daniels* v. *Newton.* It rests upon another and unquestionable doctrine. The time for performance was over when the breach complained of was committed. The contract was entire, and not severable in its character, and had been performed in part, at least; and upon a breach of the entire contract, it being committed by the defendant while the plaintiff was ready and willing to perform, the latter became entitled to recover in one action the same damages as if he had fully performed his contract." In *Maltby* v *Eisenhauer*, 17 Kan. 308, Justice Brewer said: "To what extent a contract may be held to be broken before the time for performance arrives may not be entirely settled. There are authorities which say that if, before the time for performing the contract arrives, the promisor expressly renounces the contract, the promisee may treat this as a breach, and may at once maintain an action in respect thereof. Several of these cases were for breaches of contracts to marry, and the courts in many of them express themselves qualifiedly, and as doubtful whether the proposition was correct, as applicable generally to all classes of contracts. Be the proposition ever so sound, we think it is not applicable here." In *Grau* v. *McVicker*, 10 Fed. Cas. 996, it was squarely decided that the premature repudiation of an agreement is a present breach thereof. The decision in this case is founded entirely on *Hochster* v. *De La Tour.* In *McPherson* v. *Walker*, 40 Ill. 371, all the court decided was that a refusal to perform, not withdrawn before the time of performance, operates as a waiver of an offer to fulfill the agreement at the time stipulated therein. The court, so far from adopting the English doctrine, laid down the very rule we hold to be proper in cases of this kind: "The rule is, if one, bound to perform a future act, before the time for doing it declares his intention not to do it, this of itself is not a breach of the contract;

but, if this declaration be not withdrawn when the time arrives for the act to be done, it constitutes sufficient excuse for the default of the other party." In *Davis* v. *Furniture Co.* (W. Va.) 24 S. E. Rep. 630, the court follows the English doctrine, but the question was not discussed. The leading decision opposed to the Hochster case is *Daniels* v. *Newton*, 114 Mass. 530. Nor does it stand alone. It has been followed in *Carstens v. McDonald* (Neb.) 57 N. W. Rep. 757, and *Clark v. Casualty Co.*, 67 Fed. Rep. 222. See *Kelly* v. *Oliver*, (N. C.) 18 S. E. Rep. 698. That the English courts are not disposed to give the rule in the Hochster case very wide scope appears to be shown by the fact that nothing short of the most positive repudiation of an agreement will suffice to give the innocent party, at his option, a cause of action when the repudiation is premature. See *Iron Co.* v. *Naylor*, 9 Q. B. Div. 648; *Avery* v. *Bowden*, 5 El. & Bl. 714; *Reid* v. *Hoskins*, 6 El. & Bl. 953; *Johnstone* v. *Milling*, 16 Q. B. Div. 460.

Nothing decided by this court in *Davis* v. *Bronson*, 50 N. W. Rep. 836, conflicts with our ruling in this case. There the plaintiffs and defendants had made a contract for the construction of a creamery. All that was held in that case was that plaintiffs could not, in the face of a refusal to accept, construct the creamery, and then sue the defendant for the contract price. Their remedy was to sue for damages for breach of the contract. When one has contracted to erect for another a building, and the latter, when the time for commencing construction thereof arrives, refuses to permit the builder to enter upon his premises for the purpose of carrying out his contract, it is obvious that the owner of the land has prevented the performance of the contract by the builder, and has therefore been guilty of a breach thereof. Indeed, there is eminent authority that notice that one will not stand by an agreement, though given before performance by him is due, is a present breach of the agreement, if at the time it is given the time for the other party to enter upon performance has arrived. *Danforth* v. *Walker*, 37 Vt. 244; *Hinkley* v. *Steel Co.*, 121 U. S. 264, 7 Sup. Ct. 875; *Hosmer* v. *Wilson*, 7 Mich. 304; *Sullivan* v. *Mc-*

*Millan* (Fla.) 8 South. Rep. 457, 458; *Dillon* v. *Anderson*, 43 N. Y. 232; *Lamoreaux* v. *Rolfe*, 36 N. H. 33; *Parker* v. *Russell*, 133 Mass. 74. Whether this doctrine is sound, or whether the better rule is that such notice is merely a waiver of performance, irrevocable in character, inevitably involving an ultimate breach, it is unnecessary for us to decide. If one has agreed to manufacture and deliver certain goods at a specified time, and the other party has agreed to take them, it is evident that a notice not to manufacture them is not only a waiver of the manufacture of the articles, but also of the tender of them, in fulfillment of the agreement, and the waiver is irrevocable. To advise a manufacturer that he need not manufacture, because the purchaser will not accept, is irrevocably to waive tender on the day for delivery, for he cannot deliver goods of his own manufacture without producing them. But, while a future breach is certain, can it logically be said that it has already taken place ? Is it sound to declare, as some of the decisions do, that in such a case the performance by the manufacturer has been prevented ? See *Cort* v. *Railway Co.*, 17 Q. B. 127. But we express no opinion on this point, as it is not involved. What we do decide is that the letter of September 13th, although embodying a positive refusal to perform, did not place it in the power of the plaintiff to treat the contract as broken, assuming that September 30th was the day fixed for performance. But it is undisputed that under the contract the plaintiff might, at his option, have delivered the flax at any time during the month of September. When he received the second letter from the defendants (i. e. the one dated September 13th), it was in his power at that time to exercise his option to call for the performance of the agreement. The refusal of the defendants to perform was a standing waiver of tender of performance by the plaintiff, so long as such refusal was not withdrawn, and there is no pretence that it was ever retracted. For the purpose of establishing a party's liability for breach of contract, his refusal to perform, made at the time for performance, or made before and not withdrawn at that time, is equivalent to a then offer to perform by the other

party, followed by a refusal by the party who so refuses before an offer is made. This is elementary law, and the principle is embodied in our Code. Sections 3774, 3820, subd. 3, and § 3823, Rev. Codes. Had plaintiff been absolutely entitled to performance on the day he received defendant's second refusal to perform, he could, without tender of notice, have treated the contract as then broken. Does the fact that he had only an option to call for fulfillment of the agreement affect his right ? We think not, so far as tender is concerned. All that was necessary to entitle him to insist on performance on any day prior to September 30th was notice to the defendants to that effect, and an offer to perform. But the unwithdrawn refusal to recognize the contract constituted a waiver of tender of performance. Whether it constituted a waiver of notice that the plaintiff then elected to exercise his option to make an earlier delivery of the flax, is another question. It is not claimed that the plaintiff in any manner brought to defendants' notice his purpose to exercise his option to call for performance before September 30th. To allow him to wait and watch the fluctuations of the market, and then, after the last day for delivery had passed, claim that he had secretly decided to insist upon performance at a particular time prior thereto, or on the last day itself, according as his interests would be best subserved, would be a dangerous doctrine, and one that there is no necessity for adopting, seeing that it was easy for him to manifest his election in a way that would make it irrevocable, and bring it to the knowledge of the defendants. He should not be afforded the opportunity of playing fast and loose with the rights of the other party, but should be required to declare his purpose, or be held, in the absence of notice to the contrary, to have elected to wait until the last day for performance. Unless this rule is adopted, the vendor, who has an option to deliver at any time within six months, and who is notified by the other party immediately after the contract is made that such other party will not stand by the agreement, could remain quiet during this entire period, and then select such a day as the day when he

had elected to call for performance, and therefore as the day of breach, as would give him the largest amount of damages. We hold, therefore, that the plaintiff could not claim that he decided to exercise his option to tender the property before the last day of performance,—i. e. September 30th. Indeed, he does not pretend that he is entitled to recover damages on a theory of a breach of the contract at any time between September 13th and September 30th. Proceeding on a hypothesis which to us is inexplicable, under the circumstances, he seeks to hold defendants responsible for the difference between the contract price and the price he realized on the sale of the 5,000 bushels of flax in Duluth on the 9th of September. That he cannot bind defendants for the purpose of fixing the damages they must pay by the sale in Duluth is obvious, for two reasons: First. It was not made in the mode pointed out in the statute. The statute, recognizing a settled rule of the common law, permits the vendor in an executory contract of sale, the title not having passed to the vendee, to treat the property as the property of the vendee, for the sole purpose of fixing the measure of damages, and then proceed to sell it on the theory of the foreclosure of a vendor's lien for the purchase price. The property is to be sold in the manner pointed out by the statute for the sale of pledged property. The vendee is made liable for the deficiency, if any. Sections 4833, 4988, Rev. Codes. But the sale in Duluth was not made in conformity with the provisions of the statute relating to the sale of pledged property. No notice of the time and place of sale was given to the defendants, as required by § 4760, Rev. Codes, nor was the sale at public auction upon the notice to the public usual at the place of sale in respect to auction sales of similar property, as required by § 4763, Rev. Codes. Another conclusive answer to the position taken by plaintiff, that he could bind the defendants by the price realized on the sale in Duluth, is that the contract had not then been broken. It is only after breach that the statute permits the vendor to proceed to sell as in case of a pledge, for the purpose

of fixing the vendee's liability for the deficiency. Section 4988, Rev. Codes.

It is urged that by selling the 5,000 bushels of flax in Duluth, with a view of fixing the defendants' damages, the plaintiff chose his remedy, and hence cannot pursue any other remedy for damages. We are unable to discover that any question of remedy is here involved. If the vendee breaks his contract, the vendor may recover damages according to the rule laid down in subdivision 2 of § 4988 and § 5009, Rev. Codes, unless he has in fact proceeded under § 4833, and actually fixed the damages thereunder. It is only when the property has been resold in the manner prescribed by § 4833 that the deficiency fixes the measure of damages. If the property has not in fact been resold under that section, then subdivision 2 of § 4988 and § 5009 point out the true measure of damages. The right to hold the vendor responsible for damages on this theory is not cut off unless the property has in fact been "resold in the manner prescribed by § 4833." A mere attempt to proceed thereunder will not bar the right to damages according to subdivision 2 of § 4988 and § 5009. Nothing short of an actual sale in the manner prescribed by § 4833 will have such effect. Counsel first contends that damages cannot be recovered on the theory of a sale to foreclose a vendor's lien, because the vendor failed to sell in the manner prescribed by § 4833; and yet *una et eadem flatu*, they insist that plaintiff should not be allowed damages under the other subdivision of § 4988,—a claim utterly untenable if this fact be true. They would make an abortive attempt to proceed under § 4833 fatal to the recovery of any damages whatever, although the vendee has not thereby suffered any injury whatsoever. We cannot assent to a position so repugnant to the explicit language of the statute, and so contrary to natural justice.

Having reached the conclusion that the contract was not broken by defendants before September 30th, this was the day for performance, as the plaintiff had not elected to make delivery before that time. All that was necessary to put the defendants in default

was a tender of peformance, followed by their refusal. But an offer by plaintiff on the 30th of September was waived by their unretracted repudiation of the contract. He is deemed to have made it, and to have been met by a refusal. This constitutes a breach as of that day. If, then, there was any evidence tending to support the verdict as to the amount of damages, the verdict must be sustained, although directed by the court. The fact of liability is conclusively established. The defendants having requested the court to direct a verdict in their favor, and the court having instructed the jury to find for the plaintiff, on his motion, the defendants must be regarded as having submitted all controverted facts to the court for decision; no request having been made by them, after their motion for a directed verdict had been over-ruled, that any question of fact be submitted to the jury. It follows that if there is any evidence at all to support the verdict, in point of damages, the judgment must be affirmed. The defendants by their motion took the position that there was no question of fact which they desired to have submitted to a jury, and cannot complain of the decision of any question of fact on which the evidence is conflicting which the court must be regarded as having made by instructing the jury to find for the plaintiff. After a party has moved the court that the jury be instructed to render a verdict in his favor, he must, if the court denies his motion, specifically request that there be submitted to the jury the questions of facts which he desires to have so submitted. Otherwise he is deemed to have acquiesced in the decision of such questions by the court, and, if the court directs a verdict in favor of the other party, on his motion, the defeated litigant is not in a position, in case of his failure to make such requests, to claim that any issue upon which the evidence is conflicting should have been left to the decision of the jury. 2 Thomp. Trials, § 2272; *Mayer* v. *Dean*, 115 N. Y. 550, 22 N. E. Rep. 261; *Provost* v. *McEncroe*, 102 N. Y. 650, 5 N. E. Rep. 795; *Winchell* v. *Hicks*, 18 N. Y. 558; *Colligan* v. *Scott*, 58 N. Y. 670; *Merwin* v. *Magone*, 17 C. C. A. 361, 70 Fed. Rep. 776; *Beuttell* v. *Magone*, 157

U. S. 154, 15 Sup. Ct. 566; *Chrystie* v. *Foster*, 9 C. C. A. 606, 61 Fed. Rep. 551; *Sutter* v. *Vanderveer*, 122 N. Y. 652, 25 N. E. Rep. 907. It follows, as we have already said, that, if there is any evidence in the case tending to prove the amount of damages for which the verdict was directed, the defendants, not being in a position to complain that that question was not settled by the jury, are bound by the finding of the trial court, just as they would have been bound had the verdict been voluntarily rendered by the jury. On the 9th of September, plaintiff sold 5,000 bushels of flax, through brokers in Duluth, and realized 84 cents a bushel from the sale. While this evidence was perhaps competent to prove the value of the flax on the 9th of September, it has no tendency to prove its value at such a time after September 30th as would have sufficed for the seller, acting with reasonable diligence, to affect a sale. Sections 4988, 5009, Rev. Codes, fix the measure of damages in such cases. They provide as follows:

"Sec. 4988. The detriment caused by the breach of a buyer's agreement to accept and pay for personal property, the title to which is not vested in him is deemed to be: (1) If the property has been resold pursuant to § 4833 the excess, if any, of the amount due from the buyer under the contract, over the net proceeds of the resale; or, (2) if the property has not been resold in the manner prescribed by § 4833 the excess, if any, of the amount due from the buyer under the contract, over the value to the seller together with the excess, if any, of the expenses properly incurred in carrying the property to market over those which would have been incurred for the carriage thereof, if the buyer had accepted it."

"Sec. 5009. In estimating damages the value of property to a seller thereof is deemed to be the price which he could have obtained therefor in the market nearest to the place at which it should have been accepted by the buyer, and at such time after the breach of the contract as would have sufficed with reasonable diligence for the seller to effect a resale."

In this case, there being no evidence tending to prove the

value of the property at Kelso at such time after September 30th as would have sufficed, with reasonable diligence, for the plaintiff to effect a sale thereof, the court had no basis, even on the theory that all issues of fact were submitted to it for decision, for finding the value of the flax at that time. The state of the evidence was such that the plaintiff, while establishing a breach of the contract, had failed to show any actual damages. On the evidence as it stood, the most the plaintiff could have recovered was nominal damages. For the error of the court in directing a verdict for the plaintiff on the theory that the price realized by him on the sale of the flax in Duluth fixed the measure of his damages, the judgment and the order denying a motion for a new trial are reversed, and a new trial is ordered. Under the facts of this case, the proper measure of damages is the difference between the price agreed to be paid for the flax and its market value at Kelso, at such time after September 30th as would have sufficed, with reasonable diligence, for the plaintiff to effect a sale thereof, and the excess of expense, if any, mentioned in § 4988, Rev. Codes. See Rev. Codes, § 5009.

(72 N. W. Rep. 938.