# JOSÉ ROMERO FERNÁNDEZ, Plff.,

*v.*

# JAIME CALAF ET AL., Dft.

San Juan, Law, No. 922.

### DAMAGES FOR BREACH OF REAL CONTRACT.

New Trial—Restricting Issues.

    1. This court has the power in granting a new trial, to restrain or limit the issues to be retried, where it clearly appears that the matter involved in the new trial is entirely distinct and separate from the other matters in other issues. (Reaffirming former ruling of this court in this case, 7 Porto Rico Fed. Rep. 80.)

New Trial—Restricting Issues.

    2. Whilst it may be informal to accept a new trial granted on certain conditions and at the same time seek to have the court widen the scope of the trial to other terms, it cannot be said to be a rejection of the new trial as granted.

Breach of Contract—Reliance by One Party upon Receipt of Money from the Other.

    3. While there is no doubt that when one contracts to buy an article he is not bound to help the seller obtain it, nevertheless, the purchaser may expressly or impliedly agree to furnish the money for the seller to get the article in question.

Breach of Contract—Rights of the Parties.

    4. There is no doubt that when a party to a contract gives notice he will not comply with its terms the other need not prove a tender or performance. In such a case he is at liberty to treat the contract as broken, and may recover as damages the profits he would have received through full performance. An abandonment under

NOTE.—As to power to limit the issues in granting new trial, see note in L.R.A.1915E, 239.

As to right to abandon contract because of other party's default, see note in 30 L.R.A. 33.

Fernández v. Calaf.

such circumstances is not a rescission of the contract, but an acceptance of the situation brought about by the other's wrongdoing.

Breach of Contract—Rights of the Parties.

5. An unqualified and positive refusal to perform a contract, though the performance thereof is not yet due, may, if the renunciation goes to the whole contract, be treated as complete breach, which will entitle the injured party to bring his action at once.

Breach of Contract—Rights of the Parties.

6. The underlying principle is that the plaintiff is entitled to sue upon refusal by the defendant to perform, but it still remains true that the plaintiff must prove his case after he does sue. But the elements of plaintiff's damages must nevertheless be certain, and he must show the facts exist making up his damages.

Breach of Contract—Tender by, and Performance of Conditions by, One Party, When Excused.

7. The refusal of the defendants to examine the title and otherwise carry out the contract exempted the plaintiff from tendering deeds or doing other acts which would not be accepted by defendant, but it did not exempt plaintiff from being in condition to supply a proper title or otherwise carry out what was incumbent upon him under the contract.

Breach of Contract—Exemption from Damages—Pleading Defense.

8. If there was a defect of title under the contract, the defendants would be exempt from damages. They would not have to allege any reason, provided only that a good reason existed, and if a proper defense is alleged when suit is brought, defendants would be within their rights.

Foreign Law—Proof.

9. It seems a safer course in the matter of title which is dependent upon deeds, descents, and the other heads of private, not public law, that in a civil-law country it should be shown by the statute itself as construed by the court.

Law of Santo Domingo—Contract of Sale.

10. According to the law of Santo Domingo, a contract of sale is binding without a formal public deed. As between the parties the contract is as binding. A promise of sale is as good as a deed.

Civil Law—Law of Santo Domingo—Effect of Refusal of Purchaser to Appear before Notary.

11. At civil law a sale of real estate is effected by a deed drawn by a notary. Both seller and purchaser must appear before him and

make certain allegations. If either party refuses to go before the notary and execute the deed, the other party will be unable to perform his part as to the execution of the deed, and he will be excused from executing it.

Presumption in Favor of Recorded Titles—Civil Law.

12. The presumption in a civil law country where a deed can be recorded only in favor of the person officially determined to be the owner is that such person is the owner.

Presumption in Favor of Acts of Former Sovereign.

13. A presumption exists in favor of the rightfulness of the acts by the officers of the former sovereign, the Crown of Spain, within its domain and in exercise of an apparent legitimate authority. The same would apply to officers of Santo Domingo.

Prescription against Government Santo Domingo.

14. By the Civil Code of Santo Domingo, the state, public establishments, and municipalities are subject to the same law of prescription as are individuals, and may defend against it in the same manner as the latter.

Powers of Attorney—Not Necessary to Be in Writing.

15. The law of Santo Domingo authorizes powers of attorney without any writing at all.

Presumption of Ownership Arising from Possession.

16. At civil law there is a strong presumption of ownership arising from proof of possession.

Opinion filed November 6, 1915.

---

## Statement of Facts.

This is a suit brought by José Romero Fernández against the defendants Jaime Calaf et al. for damages for an alleged breach of a contract entered into between the parties January 15, 1912, as follows:

En la ciudad de San Juan de Puerto Rico a los quince días del mes de enero, 1912, los que suscriben Sres. Joaquín Villa-

mil, etc., etc., etc., etc., mayores de edad, domiciliados en esta
capital, y el Sr. José Romero, también mayor de edad y domici-
liado en Santo Domingo, capital de la República Dominicana,
celebran el presente contrato bajo las siguientes condiciones:

*Primero.*—El Sr. José Romero vende a los señores que sus-
criben, ciento cincuenta caballerías o sean treinta mil cuerdas,
más o menos, de terreno cubierto de monte virgen, en los sitios
marcados en el mapa de la República Dominicana con los nom-
bres de "Los Quemados," "Las Charcas" y "Payabo," provincia
de Santo Domingo en la cantidad de treinta mil dólares.

*Segundo.*—Los cinco señores que suscriben, abonarán además
al Sr. Romero, la suma de cinco mil dólares por el concepto de
comisión para cubrir los gastos que ha hecho y tiene que hacer.

*Tercero.*—La escritura de ventas se otorgará, en cuanto se
termine la mensura de una parte de los terrenos que aun no es-
tán medidos; advirtiéndose que siendo las tres porciones de ter-
reno de diferentes dueños, las escrituras se otorgarán seguido
que esté lista cada una, y para entonces, deberá concurrir a la
capital de Santo Domingo una persona autorizada.

*Curto.*—El Sr. José Romero se obliga a que, los títulos de
propiedad estén en buenas condiciones y ofrezcan completa gar-
antía.

*Quinto.*—Como la compra se hace con el fin de constituir
una compañía agrícola, cuya escritura se otorgará oportuna-
mente, el Sr. José Romero tomará la sexta parte del capital o
sean cinco mil dólares.

*Sexta.*—Es entendido que las bases que preceden quedan su-
jetas al examen y aprobación de las condiciones de los terrenos
por persona autorizada que nombrarán los interesados en la com-
pra.

Fernández v. Calaf.

*Séptimo.*—Las partes convienen además que el importe total será entregado al recibir las escrituras debidamente registradas.

In accordance with the contract the parties met in San Domingo city in June, 1912, the plaintiff claiming to be ready to proceed, but the defendants finally, on June 12, refused to take the lands, and left the Island on the same day. This led to a suit in this court on behalf of the plaintiff, and upon the trial the jury, on November 28, 1913, found a verdict for the plaintiff in the sum of $21,080. Defendants moved for a new trial, which was granted February 4, 1914, and plaintiff moved that the order for a new trial be reconsidered to the extent of restricting the issues of the new trial. This motion was granted May 16, 1914. The new trial was accordingly had upon the question of title only, and, a jury being waived, the court heard the evidence and took the matter under consideration. The case has been fully argued and briefed by both sides.

*Messrs. E. B. Wilcox* and *Paul Charlton* for plaintiff.

*Mr. F. H. Dexter* for defendants Peñagarícano and Candina.

*Mr. Charles Hartzell* for defendant Generoso Candina.

*Mr. Jorge Domínquez* for defendants Jaime Calaf, Joaquín Villamil, and Ricardo Vela.

HAMILTON, Judge, delivered the following opinion:

The contract sued on was for the sale by the plaintiff and purchase by defendants of 150 *caballerías*, about 30,000 acres in

Santo Domingo at three places named Payabo Las Charcas, and Los Quemados. The contract price was $30,000, United States money, besides the $5,000, to be paid the plaintiff for expenses. The case raises a number of questions.

1. The defendants contend that the court could not restrict the issues upon a new trial as was done in this instance. The court, however, sees no reason to change the view expressed in the opinion already filed. 7 Porto Rico Fed. Rep. 80. This view is reinforced by the opinion of the Supreme Court in Norfolk Southern R. Co. v. Ferebee, June 14, 1915, 238 U. S. 269, 59 L. ed. 1303, 35 Sup. Ct. Rep. 781, shortly after the opinion in the case at bar. It was there held in a case coming up to the Supreme Court from North Carolina under the Federal Employers Liability Act that the right of a carrier is not infringed by the action of the state court in granting a new trial for the assessment of damages only. It is true that this decision of the Supreme Court is only to the effect that no Federal right of the defendants was infringed by the local practice, which is not saying that this practice would be proper originally in the Federal court. Indeed, both the Supreme Court of the United States and the supreme court of North Carolina call attention to the fact that splitting up a case has disadvantages unless it clearly appears that the matter involved in the new trial is entirely distinct and separate from the other matters in the other issues. For reasons previously given by this court, however, it appears that the practice is permissible, and in the case at bar entirely proper.

2. The plaintiff, on the other hand, contends that the criticism by the defendants of the court's order for a new trial amounts to a rejection of a new trial, and that judgment should be entered for the plaintiff without more. This, however, is

Fernández v. Calaf.

too strict a construction. It is no doubt true that a party can refuse a new trial offered upon terms which he thinks infringe his rights, and can appeal or take such other steps as he deems proper. This was not done by the defendants. While it may be informal to accept a new trial granted on certain terms and at the same time seek to have the court widen the scope of the trial to other terms, it cannot be said to be a rejection of the new trial as granted. It is more like an appeal to the discretion of the court to widen the former order.

3. The new trial as ordered, therefore, is not upon the merits as a whole. The issue involved is only that relating to title. The contract was construed as one of sale, not of agency. It provides that the plaintiff sells certain lands and obligated himself that the deeds were in good condition and safe. (*Se obliga aque los titulos de propiedad estén en buenas condiciones y ofrezcan completa garantía.*) The verdict in favor of the plaintiff was general and covered all points, but for reasons expressed at the first trial, as well as on subsequent proceedings, the rulings of the court on the title were meant to be provisional, because neither party was then fully prepared with the law of this foreign country on the subject of title to lands. Everything is to be regarded as settled by the verdict of the jury, except that as to the good condition of the deeds and the safety of the title. It was, and is, somewhat difficult under the general nature of this order to define exactly what evidence should come in and what should be excluded. Upon the new trial the court several times expressed the view that the matter of title extended to the form of the deeds and the nature of the title to the lands. This would seem to be correct as covering the form and substance of the title involved. If evidence was admitted going beyond these

VIII. Porto Rico—24.

two points, it might and will be disregarded. In the case at bar this course is especially necessary because the plaintiff, in his care to throw all the light possible upon the issue, introduced without objection evidence upon several matters probably not strictly germane, and upon which, when introduced, the court could not properly refuse to admit cross-examination. Upon a lengthy trial it is very difficult to hew close to the line in such matters; and where the trial is before the court, and not before a jury, the ends of justice will be subserved by admitting everything which seems to relate to the issue, and not considering what turns out afterwards to be foreign thereto.

4. The words of the contract require: "4. Mr. Romero binds himself to see to it that the deeds to the property are in good condition and safe" (*ofrezcan completa garantía*). It would seem that in this case no question arises as to the form of the deeds, for the reason that no deeds actually passed between the parties, and that the plaintiff did not tender any deeds. It is to be remembered however, that this contract was made in Porto Rico and was to be performed in Santo Domingo, both of which are civil law countries. It is true that the civil law of Porto Rico is Spanish, and that the civil law of San Domingo, although in the Spanish language, is really the Code Napoleon, that is to say, French law. It is not perceived, however, that, for the purposes of this case, there is any material difference between the two systems.

5. It is argued on behalf of the defendants that the plaintiff never put himself in condition to perform the contract so far as relates to furnishing the title required. They contend that their contract was with the plaintiff alone, and that they are not concerned with his dealings with the original landowners; that

whether or not he was ready to sign a deed with these landowners before a notary in San Domingo is no concern of the defendants, and that therefore they were under no obligation to accompany him before a notary. That if the plaintiff had to rely upon the money which he was to obtain from the defendants in order to complete his purchase from the landowners, he did not own the land, and therefore could not carry out his contract to sell.

"Where contract vendor has not means of obtaining title to the land he contracted to convey he cannot supply the deficiency in an action for breach of the contract by the vendee by evidence that if the vendee had made a cash payment the vendor would have been able to obtain title, where the vendee was not required to make the payment until he received title from the vendor." Brown v. Lee, 113 C. C. A. 141, 192 Fed. 817.

The legal effect of a covenant to sell is that the land shall be conveyed by a deed from one who has a good title, or full power to convey, a good title. This is a condition precedent, without the literal performance of which the purchasers are not bound to pay their money. Washington v. Ogden (Turner v. Ogden) 1 Black, 450, 17 L. ed. 203.

Where one party agrees to convey to another by warranty deed a certain tract of land the legal title to which is vested in a third person, the procuring of the conveyance of the land by such third person with his warranty will not answer its requirements. Hussey v. Roquemore, 27 Ala. 282.

The part of the contract material to the point now under discussion is containd in the first three paragraphs, which have been translated as follows:

"1. Mr. José Romero makes sale unto the subscribing parties of 150 *caballerías,* or 30,000 *cuerdas,* more or less, of land

Fernández v. Calaf.

covered by virgin forest located on the places marked on the map of the Dominican Republic by the names of "Los Quemados," "Las Charcas," and "Payabo," province of Santo Domingo, for the sum of $30,000.

"2. The five parties undersigned shall pay to Mr. Romero, in addition thereto, the sum of $5,000 as commission to cover any expenditures heretofore incurred, or which may hereafter be incurred.

"3. The deed of sale shall be executed as soon as the measurement of certain part of the lands not yet measured be finished; bearing in mind that as the three portions of land belong to different owners the deeds shall be executed as soon as each is ready, for which time an authorized person shall have to come to the capital of Santo Domingo."

While there is no doubt of the principle that when one contracts to buy an article, he is not bound to help the seller obtain it, nevertheless, there is as little doubt that the purchaser may expressly or impliedly agree to furnish the money for the seller to get the article in question. It may very well be that the purchaser of land in a foreign country would prefer to have the immediate warranty of someone with whom he is acquainted, and yet be willing to advance the money necessary for this person to obtain it. There is no law against this. It is a matter of contract. The question is, What was contemplated by the contract at bar? This contract in ¶3 expressly says that it is understood the three tracts at the time of the execution of the contract belong to different owners; further, that the respective deeds will be signed as each one is ready, and furthermore, that at that time—that is, the signature of the deed—a person authorized by the purchasers will go to the capital of the San Domingo Re-

Fernández v. Calaf.

public. This must mean either that the owners at that time were to make the deeds to the defendants in this case, or that the defendants were ready to pay for each piece as the title was ready, the total price—that is, the balance of the money—not being delivered until the registration of the deeds to the defendants. If the plaintiff was to buy the land out of his own pocket, there would be no necessity for the above provisions as to deeds from the then existing owners. It being conceded by both sides that the deeds were to come direct from the plaintiff, it follows, therefore, that the defendants were concerned in the purchase of the respective pieces by the plaintiff. If this be so, and the plaintiff had the owners of all the pieces ready to execute at one time and place, and the plaintiff was ready at that time and place in his turn to pass to the defendants by deed the title so to be made him, it cannot be said that the defendants were unconcerned in the proposed visit to the notary. The plaintiff's testimony is that everything was in readiness for this conveyance to him and his conveyance to the defendants, and the defendants introduced no evidence to overcome this statement. It follows, therefore, that the defendants did not live up to their part of the contract as to the execution of deeds, and consequently cannot depend on the theory that the plaintiff must do the impossible thing under the civil law of registering a deed they prevented him from making.

6. It is contended for the plaintiff that the fact the defendants declined to proceed with the trade renders it unnecessary for the plaintiff to prove title at all. The argument is that the defendants thereby abandoned their right to criticize the title.

Lord Campbell held in Hochster v. De la Tour, as early as 1853, 2 El. & Bl. 678, 22 L. J. Q. B. N. S. 455, 17 Jur. 972, 1

Week. Rep. 469, 6 Eng. Rul. Cas. 576, that if the defendants refuse to perform their obligations under a contract, they cannot require a performance by the plaintiff of his part. To the same effect is the leading case of Hunt v. Test, 8 Ala. 713, 42 Am. Dec. 659, A. D. 1845, where the court says: "It has been held that an offer to perform which is prevented by the party in whose favor performance is to be made is equivalent to performance." A later construction of the same principle is found in Worthington v. Gwin, 119 Ala. 44, 43 L.R.A. 382, 24 So. 739, which holds that where the duty of performance is of a continuing character, and the refusal to perform is destructive of the objects of the contract, and makes it impossible of performance, the breach will act as a discharge of the unoffending party.

There is no doubt that when a party to a contract gives notice he will not only comply with its terms the other need not prove a tender of performance. Gray v. Smith, 28 C. C. A. 168, 48 U. S. App. 581, 83 Fed. 825. In such a case the third party is at liberty to treat the contract as broken, and may recover as damages the profits which he would have received through full performance. An abandonment under such circumstances is not a rescission of the contract, but an acceptance of the situation brought about by the other's wrongdoing. Where a contract is not performed, the party who is guilty of the first breach is the one upon whom all the liability rests. Anvil Min. Co. v. Humble, 153 U. S. 540, 38 L. ed. 814, 14 Sup. Ct. Rep. 876, 18 Mor. Min. Rep. 97. On a contract for the sale of goods the renunciation by the vendee excuses the vendor from making a tender.

An unqualified and positive refusal to perform a contract, though the performance thereof is not yet due, may, if the renunciation goes to the whole contract, be treated as a complete

Fernández v. Calaf.

breach which will entitle the injured party to bring his action at one.

"The rule is disapproved in Daniels v. Newton, 114 Mass. 530, 19 Am. Rep. 384, and in Stanford v. McGill, 6 N. D. 536, 38 L.R.A. 760, 72 N. W. 938, on elaborate consideration. The opinion of Judge Wells in Daniels v. Newton is generally regarded as containing all that could be said in opposition to the decision of Hochster v. De la Tour, and one of the propositions on which the opinion rests is that the adoption of the rule in the instance of ordinary contracts would necessitate its adoption in the case of commercial paper. But we are unable to assent to that view. In the case of an ordinary money contract, such as a promissory note, or a bond, the consideration has passed; there are no mutual obligations; and cases of that sort do not fall within the reason of the rule." Roehm v. Horst, 178 U. S. 1, 17, 44 L. ed. 953, 960, 20 Sup. Ct. Rep. 780.

This case rested upon the fact that the defendant was to furnish instructions for boring rails which the plaintiff was to furnish. When the defendant refused to give the instructions, it was held that the plaintiff was excused from manufacturing and tendering the rails.

The underlying principle is that the plaintiff is entitled to sue upon refusal by the defendants to perform, but it still remains true that the plaintiff must prove his case after he does sue. That is to say, it is unnecessary for him to go on and do the vain thing of tendering what the defendant has already announced he will not accept, but as expressed in Gray v. Smith, supra, the elements of plaintiff's damages must nevertheless be certain, and he must show the facts exist making up his damages. In the case at bar the refusal of the defendants to examine the

title and otherwise carry out the contract exempted the plaintiff from tendering deeds or doing other acts which would not be accepted by defendants, but it did not exempt him from being in condition to supply a proper title or otherwise carry out what was incumbent upon him under the contract.

7. To somewhat the same effect is the plaintiff's contention that, because the defendants originally gave as reasons for not carrying out the contract that they were afraid of the revolution following the assassination of President Cáceres in 1911, they cannot now be heard to set up a defect of title. This, however, is not the law. If there was a defect of title under the contract, the defendants would be exempt from damages. They would not have to allege any reason, provided only that a good reason existed, and if a proper defense is alleged when suit is brought, the defendants would be within their rights.

8. The facts of this case present an unusual state of affairs. The title to be settled is not only one at civil law, but one arising under the French civil law of a Spanish country. It has been argued, perhaps by both sides, that the court is bound to take the opinion of experts upon the question of such law just as it is bound to take the opinion of experts upon any matter not within ordinary observation, and both sides have introduced the evidence of lawyers, claimed to be of standing, as to the Dominican law in regard to titles. In Reilly v. Steinhart, 161 App. Div. 242, 146 N. Y. Supp. 534, a Mexican attorney was admitted as an expert to construe a statute already in evidence. A witness shown to be conversant by long practice with foreign law is competent to prove such law. 25 L.R.A. 452, note. Judge Lacombe has held that a foreign lawyer is a competent witness to construe the statutory law of his country as to what

Fernández v. Calaf.

documents create a corporation under that law. The reason given is that statute laws do not always construe themselves. Badisch Anilin & Soda Fabrik v. A. Klipstein & Co. 125 Fed. 543. In The Asiatic Prince, 47 C. C. A. 325, 108 Fed. 289, it was held that the customs practice of a foreign country may be proved in the Federal court by calling its lawyers and interrogating them, and the court declared that the contradiction of even a young lawyer in that case by excerpts from the statutes was unpersuasive, for the reason that administrative construction is often quite as important as the words of the law itself.

There is no doubt that the decisions of the court of last resort are of great value in construing a statute, and it may well be that where administrative construction is necessary, as in the case of corporation law, expert opinion is admissible. It seems a safer course, however, in the matter of title, which is dependent upon deeds, descents, and the other heads of private, not public law, that in a civil law country it should be shown by the statute itself as construed by the courts. The presumption at civil law is different from that at common law. The common law is not codified, and even a statute is to be construed in connection with the decision of courts as to the common law. At civil law, however, everything is supposed to be in the Code itself, and, if it is not in the Code or clearly implied therein, it does not exist as law, for there is no law on the subject. So far as this case is concerned the Dominican law is found in the Civil Code, notarial law and special laws discussed separately. Codes of Commerce, Criminal Code, and Codes of Criminal and Civil Procedure are in force but do not affect the suit at bar. It is very true that at civil law, commentaries carry greater weight

than at common law, but here it is not the case of commentaries, but of opinions of practising lawyers. The court is willing to consider these with respect, but to consider them in connection with the law which they presume to expound. It might even be, that, if there was no written law the opinions as to the law would carry great weight, but neither is this within the case at bar. The court has thought that its duty requires the production of the Dominican laws, and their construction by this court itself. The method of proof of a foreign law is different, but when it is proved the rules of construction as between domestic and foreign laws do not greatly vary.

9. The case at bar, however, is not altogether one of the absolute construction of title deeds to land. The contract in litigation does not, as is usually the case at common law, require a good title, much less a perfect one. It requires only that the titles be safe (*ofrezcan completa garantía.*)

According to the Dominican law a contract of sale is binding without a formal public deed. As between the parties, the private contract is as binding. Cód. Civ. art. 1582. A promise of sale is as good as a deed. Cód. Civ. arts. 1322, 1589. The vendor sells only what title he has (Id. art. 2182), but the terms of the contract would prevail. An authentic instrument is one prepared by a notary, executed before him, and certified by him (Id. art. 1317). These provisions would apply to the deeds prior to the sale by plaintiff to defendants. It was not contended that any such public deed passed between the parties to this suit. There was merely the private instrument now sued on, and the immediate question is, What was the extent of the warranty for which it provided?

Fernández v. Calaf.

Under the Civil Code of San Domingo a warranty embraces two things,—peaceful possession and no hidden defects.

[1] "Art. 1625.—La garantía que debe el vendedor al adquiriente, tiene dos objetos; es el primero, la pacífica posesión de la cosa vendida; y el segundo, los defectos ocultos de esta cosa o sus vicios rehibitorios."

Even without express mention of warranty the vendor is obliged to guarantee against eviction. Art. 1626. A warranty, when made, covers the return of the price,— of the fruits,— costs, and all damages.

[2] "Art. 1630.—Cuando se ha prometido la garantía o no se ha estipulado cosa alguna con relación a ella, tiene derecho el comprador, en el caso de evicción, a demandar del vendedor: 1° La devolución del precio: 2°. La de los frutos, cuando está obligado a dárselos al propietario que lo vence en juicio: 3°. Las costas ocasionadas por la demanda hecha por el comprador en garantía, y las causadas por el demandante originario: 4°. En fin, los daños y perjuicios, así como las costas y gastos legales del contrato."

The legal result, therefore, of the contract between the parties

---

[1] Article 1625.—The guaranty which the vendor owes to the purchaser has two objects: First, peaceful possession of the thing sold; and, second, security against latent defects of said thing or its rehibitory defects.

[2] Article 1630.—When guaranty has been pledged, or nothing has been stipulated in relation thereto, the purchaser has the right, in case of eviction, to demand from the vendor the following:

1. The return of the purchase price.

2. Return of the crops when he is obliged to deliver same to the owner who wins in the trial.

3. The costs incurred by the purchaser under warranty title, and those caused by the original complaint.

4th and last. All damages as well as costs and legal expenditures under the contract.

Fernández v. Calaf.

is that the plaintiff was personally bound in the several respects above mentioned, and that the defendants must carry out their contract and look to him for damages unless there were radical defects covered by the legal provisions mentioned.

10. Before considering the supposed defects it should be noted that the question of safe titles covered by the contract in question is one which by the laws of San Domingo, as well as by the laws of Porto Rico, is primarily committed to the recording officer. Cód. Civ. art. 2196 et seq. While there may be an appeal from his decision, still prima facie the registrar's admission of a deed to record makes it in the eye of the law at least a safe title. It is not in general liable to collateral attack, nor is it in general open to direct attack when held by a third person. Cód. Civ. art. 1165. It is perfectly true the contract requires that the deeds be recorded before the purchase money was payable, and in this instance there was not only no record of a deed from the plaintiff to the defendants, but no actual deed drawn. It is not, however, a question of tender in the common-law sense. At common law deeds are, or at least may be, individual matters, and not necessarily indentures signed by both parties. At civil law the contrary is true. Both seller and purchaser must appear before a notary and do certain acts and make certain declarations, upon which the notary draws the deed, which is executed in his presence by both parties. The notary, according to the *Leyes y Decretos sobre el Notariado* of San Domingo, retains the original in his protocol, and the parties receive certified

copies. It is obvious that if one party refuses to go before the notary, this procedure cannot take place; and in the case at bar the facts seem to show, and the jury by their verdict found, that the defendants refused to go before the notary and execute the deed. This made it impossible for the plaintiff to perform his part as to execution of a deed, and he was excused from executing it. The defendants, therefore, have estopped themselves from setting up any question of title so far as relates to the deed from plaintiff to them, and the question must go one step further back. Did the plaintiff have a title which could have been put in proper form and recorded?

11. The tracts in question lie in the commune of Boyá to the south of Río Yuna not far from where it empties into the Bay of Samaná near the east end of San Domingo. These tracts bear the names, respectively, of Payabo, containing, according to survey, 40 *caballerías;* Las Charcas containing 80 *caballerías,* and Los Quemados containing 68 *caballerías.* The two former lie north of the Río Ara, and Los Quemados to the south of that stream where it empties into Río Payabo, which is the boundary of the property on the west. Río Payabo in its turn empties into Río Yuna some miles from the property in question. These tracts are adjacent and make up one larger tract, which, besides the Río Payabo, is traversed by roads running northwardly from the village called Boyá to settlements on the banks of the Río Yuna. The Yuna valley is one of the largest in San Domingo and is traversed by one of the few railroads, lying, however, on the other side of the Yuna from these lands. The Bay of Samaná is, with San Domingo city on the south, and Puerto Plata on the north, one of the principal shipping points. San Domingo city, while not many miles distant from the lands in question,

is separated from them by the central range of the island, known at this point as "Mt. de las Muertes," in which is situated Boyá, above mentioned. Good roads are lacking, and travel is by horseback and the like.

The contract is for the sale of 150 *caballerías,* of 30,000 acres, more or less, of land covered with forest at the places marked on the map of the Republic of San Domingo with the names of Los Quemados, Las Charcas, and Payabo. It does not prescribe how much there must be at any one of the three places, and will be satisfied if there is provided a total of 30,000 acres more or less. The titles being different, however, the three tracts must for some purposes be considered separately. ·

While Payabo contains 40 *caballerías,* it is admitted that the plaintiff controlled only half of this amount. The title is shown by the evidence to have originated March 6, 1895, in a deed duly recorded by the Roman Catholic Church to one Jiménez and to Dionisio de los Santos. These two men almost immediately divided the property by public partition, and each one took possession of his part and exercised ownership thereof. De los Santos was at this time the husband of Teodosia Cabral. The father died, but the mother was at the time of the contract living, together with their five children, all of age. Of these children Marcelino, acting for himself and his brother Julián and his sister Ana Luisa, executed the papers to plaintiff Romero. The mother testifies that she did not join because she had already exchanged her right in this property for other lands, which would eliminate her for all practical purposes. The testimony seems to show that all parties were present before the notary at the time plaintiff proposed to execute the deed and were only prevented from doing so by action of the defendants. Even

Fernández v. Calaf.

if this had not been so, the consent of two besides Marcelino seems to be clear. This would seem to cover about 12 *caballerías* in any event.

It is true that there is no clear evidence as to the chain of title back of the Catholic Church. It may be that in a Spanish colony there is a presumption that the church was the lawful owner. The evidence at all events seems satisfactory that the church and de los Santos had possessed the land long enough to have, as between individuals, a good title under the Statute of Limitations. The recorded title being in de los Santos, if not in his heirs, the presumption in a civil law country where a deed cannot be recorded unless by one officially determined to be the owner, is that they were the owners. This presumption might be rebutted, but there is no rebutting evidence offered in this case. It would seem, therefore, that the title to something over half of Payabo is shown to be good for the purposes of this case.

12. The title of Las Charcas is shown to rest in Petronila Sánchez, at the time of the contract a widow. She bought from the Catholic Church in 1896, and the church had been in possession since about 1847. Her deed was duly recorded. Her son-in-law Isais Rojas acted as her agent in making sale to Romero. It was not necessary for her children to join in this sale, as it does not appear they had any interest. There is in the papers an obligation on the part of this agent to secure the sale of other co-owners, but there is no evidence that there were any other co-owners. This may refer to others to whom sales had previously been made of other parts of the tract. This title, therefore, is satisfactory under the San Domingo law.

13. The last tract to be considered is Los Quemados, comprising at least 50½ *caballerías*. If this is satisfactory, the total

amount available in the three tracts was about the 150 acres called for by the contract. The clause "more or less" would, moreover, account for any small discrepancy, and no legal "lesion" or failure of quantity or quality, which would authorize rescission or diminution of price, is shown to any tract. Cód. Civ. art. 1658, 1674.

Los Quemados is shown by the evidence to have been bought April 29, 1892, by José de Jesús from the San Domingo government. This was under a statute, or, as it is expressed in San Domingo, a "decree of the National Congress by initiative of the executive power." This reads as follows:

"Section 1. Every Dominican agriculturist or industrial person who shall have lived on government lands or on lands adjacent thereto for a long period of time, and who shall have cultivated or occupied the same with any industry, shall be deemed to be the owner thereof, and shall not be subject to the payment of rent in any manner whatever.

"For persons engaged in the breeding industry this right shall apply only in places devoted by law for such purposes, and to those portions of land occupied by them for living and for inclosing, castrating, and branding their animals.

"Section 2. Dominicans who shall have been occupying government lands under title of lessees shall continue to occupy them under the same title, pursuant to such contracts as they might have entered into; and after the expiration of the said contracts, the lessees shall have the same status as those comprised in the preceding section and the paragraph thereof.

"Section 3. The administrator of the treasury in the respective provinces and districts shall issue titles to property under §§ 1 and 2 of this decree to such agriculturists, industrial per-

Fernández v. Calaf.

sons, or breeders as shall make claim therefor, and shall produce a survey and plan of the land occupied, with a correct delineation of boundaries and the proper certificates setting forth that they have thereon their plantations stock or industries."

The deed in evidence was by the acting administrator of the treasury of the province of San Domingo to José de Jesús, and was executed before a notary public and recorded in San Domingo on April 29, 1892. It expressly declares that the provisions of this law apply to de Jesús in regard to the land in question, and proceeds to convey the same to him on behalf of the Republic of San Domingo.

The presumption is in favor of the rightfulness of an act by officers of the Spanish Crown of Spain with its domain, and in exercise of an apparent legitimate authority. United States v. Davenport, 15 How. 1, 14 L. ed. 575. Of course the same would apply to officers of San Domingo. As to the facts prerequisite to the issue of the deed, the recital of the Dominican official making the deed is sufficient. Thus, where "the fact that the applicant [for a Spanish grant] possessed the requisite amount of property to entitle him to the land he solicited was submitted to the officer who decided upon the application, and that he [the applicant] is not bound to prove it to the court which passes on the validity of the grant." Chouteau v. United States, 9 Pet. 147, 9 L. ed. 82. Apart from the presumption that a government will do right, it would seem that as to all three tracts in question it was barred by its own Statute of Prescription. [1] Dominican Civil Code, art. 2227.

---

[1] Article 2227.—The state, public institutions, and municipalities are subject to the same prescription as private individuals, and they may defend against it in the same manner as the latter.

VIII. Porto Rico—25.

Fernández v. Calaf.

"El Estado, los establecimientos públicos y municipios, están sometidos a las mismas prescripciones que los particulares, pudiendo oponerlas del mismo modo que éstos."

. There seems to be no reason why the defendants would not have been protected by prescription in the Jesús possession with good faith and *justo título*. [1] Dominican Civil Code, art. 2265:

"El que adquiere un inmueble de buena fe y a justo título, prescribe la propiedad por diez años, si el verdadero propietario vive en el distrito judicial, en cuya jurisdicción radica el inmueble; y por veinte años, si está domicialiado fuera del dicho distrito."

Proper title (*justo título*) refers to the form of the instrument, and, as seen above, this is satisfactory. Good faith (*buena fe*) is presumed. Código Civil, art. 2208. Commentaries on this subject are cited as follows:

"Good faith consists in the legitimate belief of the possessor that his title makes him the owner; and that this belief arises from the fact that he believes himself to have dealt with the true owner." Baudry, Lacantinería et Tisier, No. 679.

"The acquiring party cannot plead good faith when the act constituting the legal title comes from a person that he knew was incapable or had not sufficient power to consent to the disposal." 4 Fouzier Herman, p. 1845, No. 18.

"Good faith should be founded on a title, and the title should be transmissible of ownership; and for the title to be transmissible of ownership it is necessary for it to emanate from the owner

---

[1] Article 2265.—When one acquires a property in good faith and under a good title, prescription shall lie in his favor after the lapse of ten years, if the true owner lives within the judicial district where the property is located; and after twenty years if he should live outside of said district.

Fernández v. Calaf.

or from whoever shall have capacity to dispose of the property.
. . . If the author has not the right to dispose of the property and the possessor knows it, the latter has not good faith, because he cannot believe himself to be the owner when he knew that the author thereof could not transmit to him the ownership thereof." 32 Laurent, p. 430, No. 406.

· If good faith is presumed, and the law does not require the prerequisite of survey and the like to be set out in the deed, there is nothing in the case under the above principles to indicate that de Jesús acted otherwise than in good faith. Except the possibility which might arise from a successful.revolution, there is nothing in the case, therefore, which would show any right or probability that San Domingo would or could resume the title to this land.

14. Leaving, therefore, the question of derivation from the government, and taking up the question of title as between individuals, the presumption controls in San Domingo as in most civilized states that one deceased dies intestate. As in America, "an estate in fee, upon the decease of an ancestor, is presumed to descend, in pursuance of the laws of inheritance, unless the descent is shown to have been interrupted by a devise." Baxter v. Bradbury, 20 Me. 260, 37 Am. Dec. 49 and 52. The testimony indicates that Gen. de Jesús left no will. The property which he acquired during his marriage would, therefore, under the Dominican law, become community property. Cód. Civ., arts. 1393, 1402.

[1] "Art. 1400.—La comunidad que se establece por la simple

---

[1] Article 1400.—The community which is established by the mere declaration of marriage under the system of the community, or in the absence of a contract, is subject to the rules set forth in the six following sections.

declaración de casarse bajo el régimen de la comunidad, o a falta de contrato, está sometida a las reglas explicadas en las seis secciones siguientes."

Upon his death half belongs to his widow and half to his child or children. Cód. Civ. arts. 1441, 1453, 718, 731. The daughter was the wife of Evangelisto Veloz, who was testified to have full powers from his wife and mother to sell to plaintiff Romero. It may be added that the same law applies to the descents in the other two tracts. Cód. Civ. arts. 718, 731, etc.

While it was true that Los Quemados originally consisted of 68 *caballerías*, the testimony shows that $17\frac{1}{2}$ had been sold off to different parties. This would leave $50\frac{1}{2}$ *caballerías* for sale to Romero.

15. The defendants contend that, even admitting all other points, the plaintiff does not show powers of attorney from some of the owners of the several tracts. It would seem that the law of San Domingo authorizes such representation without any writing at all, leaving open the matter of proof. Cód. Civ. art. 1985. The point does not appear to be necessary in this case, because the testimony shows that all the parties not formally represented were themselves present in San Domingo city at the same time with the defendants, and were ready to execute whatever deeds were required. Even if Romero had not authority to make deeds in their names, they could and would have made the deeds themselves to him or the defendants, as preferred, and he was ready to give his warranty.

16. This hearing was restricted to the matter of title, and full consideration has been given to the subject. A formal paper title, however, is not necessary for the purpose of this case. The parties represented by the plaintiff were in the full possession

of the respective tracts. There is a legal presumption of ownership arising upon the proof of possession claimed in fee, as in the case at bar. This is true at common law. Actual possession is prima facie evidence of legal title. Jackson ex dem. Stewart v. Town, 4 Cow. 599, 15 Am. Dec. 405. Possession of land by a party claiming it in fee is prima facie evidence of the ownership and seisin of the inheritance. Ricard v. Williams, 7 Wheat. 59, 5 L. ed. 398. At civil law the presumption is even stronger where the possession is under recorded deeds, as in this instance. While the action of a registrar is not indisputable, it is entitled to great weight. The civil law requires that he pass upon the validity of a title before he admits a deed to record, while at common law any deed can be admitted to record and its weight be decided in litigation between the parties.

It is true that under the circumstances above discussed there is no evidence, and can be no evidence, that the deeds were recorded as contemplated by the contract. Evidence, was offered that the same property was within a few days later sold to other parties, and the deeds duly recorded. This testimony was excluded so far as it was tendered to show title. What happened afterwards could not throw any light upon the title at the date in controversy. This testimony might be legitimate on the question of the recordability of the title. The defendants prevented the record from taking place at the right time, and it would seem that they cannot oppose evidence that the same title within a few days thereafter actually passed the record officers. The evidence was not offered, however, for this purpose, and its exclusion was proper.

17. It only remains to notice some objections to evidence. There were a number of objections overruled *pro forma*. This

is a method which has developed in this court of admitting evi-dence subject to a change of mind of the court later. Upon examination the court does not think that any error was committed in these admissions, and has no wish to change its ruling. But there was a matter separately reserved as to the admission of the Official Gazettes purporting to convey a copy of several laws. The first is the Gaceta Oficial of July 7, 1883, containing, *"Ley declarando propietarios de los terrenos o los posesores que lo han cultivado por mucho tiempo."* However important this law may be, the offer could either have been granted or refused without injury, because this same law is in evidence in connection with the testimony of a witness offered by the defendants.

Another *gaceta* contained the notarial law, but this need not be considered, as this statute is in evidence in the official volume published in 1911. The same is true of an amendment of the notarial law approved by President Cáceres, May 24, 1910. At least of equal importance with this, however, is the Gaceta of August 26, 1911, containing the Ley de Agrimensura, practically reinstating the law of June 26, 1882, revising the original law of 1871 on this subject. This gazette, if admitted, will show the law to be that the acts of surveyors are not only those of public officials, and therefore entitled to the same rank as other au-thentic acts (Cód. Civ. arts. 1317, 1319), but that these surveyors called the adjoining landowners together, examined deeds, and practically acted as a court in regard to boundaries. There are surveys in evidence by one Mejía claiming to act under such a law.

The admission of the *gacetas* was refused upon the trial before the jury, and on the trial of title before the court alone was left open for decision under the new circumstances presented.

These were that the plaintiff, while a witness on the stand, testified that he and the official custodians of the public laws had compared the laws as published in these *gacetas* with the official records at the capital of San Domingo, and found them to be correct copies. Plaintiff had been very diligent, in obtaining certificates under seal from these officials that the *gacetas* were correct copies of laws, but, as previously held, these did not come up to the measure of proof required for foreign laws. It is not clear that a private individual could by examination make these *gacetas* admissible in evidence by the comparison testified to. But there is a circumstance in the case which seems to change the situation. The difficulty in the mind of the court was to find some law authorizing publication of laws in the Gaceta. This has been practically supplied on an examination of the Código Civil deposited in the court library. This book was published by authority in 1901, and contains not only a direction, dated in 1900, from President J. I. Jiménez to the Minister of Justice and Public Instruction to publish the Code, but the decree of April 17, 1884, signed by President U. Heureaux for the original adoption of the Código Civil as copied July 4, 1882, from the Code Napoleon, and a direction that this decree be promulgated in the Gaceta Oficial. The same is found in the decrees of the same year adopting the Códigos de Procedimiento Civil, de Comercio, Penal, Procedimiento Criminal and Procedimiento Militar. The same phraseology is not followed in the notarial and other laws of 1910. The expression there is that the law shall be published in all the territories of the Republic. But the custom, being thus shown to have the force of law from as far back as 1883, must be presumed to continue in the absence of proof of its abrogation. The official codes themselves showing

such publication in the Gaceta Oficial in San Domingo, a court sitting in a foreign country, will not and cannot presume otherwise than that the practice was according to law.

It follows, therefore, that the *gaceta* offered should be admitted so far as relates to the laws published therein, and they have been considered accordingly for what they are worth.

18. There have been at least two stipulations of counsel in the case as to evidence to be used in the court. They are as follows:

"It is hereby stipulated and agreed by counsel for all parties here present that such portions of the testimony already taken in this case at any hearing thereof as shall have been directed to the issues now under hearing, restricted by a former order of this court to the form and sufficiency of the titles offered by the plaintiff herein, may be considered as in evidence and referred to by counsel for either party in their arguments and by the court for its determination of the same.

"It is hereby stipulated and agreed by the parties hereto, by their respective attorneys, that all certificates, affidavits, and other evidence filed herein in support of, and in opposition to the motion of the defendants for a new trial of this cause, after the former trial thereof, which resulted in a verdict and judgment in favor of plaintiffs herein, shall be considered as in evidence in the hearing hereof by the court which was concluded upon March 6, 1915, solely, however, in so far as the same relate to the titles of the lands in question in this cause, in so far as same may be material."

It seems only right to say that the court has been able to get but little light from the evidence thus attempted to be admitted. The reference of the agreement is very general, and the court

Fernández v. Calaf.

cannot undertake to pick out the papers meant for its consideration and to pass upon their materiality. They should be referred to by name and date, or otherwise identified. It would seem, moreover, that they are largely cumulative and would probably not affect the decision of this matter.

The case has now been discussed from all points of view, and the conclusion of the court must be that the plaintiff made out the title called for by the contract; that is to say, he could have carried out his part of the contract if the defendants had carried out theirs, and so he is entitled to damages for their breach of the contract. The court, therefore, finds the issue of title in favor of the plaintiff, and a judgment will be entered for the plaintiff upon the whole case.

It is so ordered.

### Amendments to Main Opinion, January 10, 1916.

The court having some time since asked counsel on both sides to suggest any corrections of fact due to misprint or clerical error in the opinion filed in this case November 6, 1915, finds that the following corrections should be made, and adopts them as corrections in that opinion as printed, and the said opinion is amended so as to read with these corrections inserted.

Wherever it appears that the opinion reads "150 acres" it is understood that 150 *caballerías* is meant. See 2d line, p. 13, of opinion.

Where it appears that Las Charcas contains 80 *caballerías* in the opinion, same should read "88 *caballerías*."

That in paragraph 12 of the printed opinion, in 4th line of same, the words, "since about 1847," shall be stricken, and in

their stead inserted, "since time immemorial, as is recited to appear in judicial proceeding had in Samana, before the alcalde of that commune, Sr. Ramon Andujar, on the 27th day of April, 1847, confirmed by another proceeding before the Alcalde San Antonio de Yuma, on the 21st day of July, 1890, ratified by the tribunal of the province Espaillat, on the 8th of August of the same year."

After the word "Santos," page 11 of printed opinion, the following shall be inserted: "The land above referred to belonging to the church from time immemorial, as is recited to appear from judicial proceeding had in Samana, before the alcalde of that commune, Sr. Ramon Andujar, on the 27th of April of the year 1847, confirmed by another proceeding before the alcalde of San Antonio del Yuma, on the 21st of July, 1890, ratified by the tribunal of the province Espaillat on the 8th of August of the same year."

